No. 36,951

LORRAINE WILSON and RALPH J. WHITSON, *Appellees*, v. H. E.
HOLM and MRS. H. E. HOLM, his wife (whose true given name is
unknown), JOHN H. WILSON and MRS. JOHN H. WILSON, his
wife (whose true given name is unknown), JOHN H. WILSON,
Trustee, R. I. PRICE-ASHBY and C. M. ASHBY, her husband,
THOMAS H. ALLAN and ALICE ALLAN, his wife, *Appellants*.

(188 P. 2d 899)

Opinion filed January 24, 1948.

*W. C. Attwater,* of Wichita, argued the cause, and *P. J. Warnick* and *Alan B. Phares,* both of Wichita, were with him on the briefs for the appellants.

*C. R. Holland,* of Russell, argued the cause, and *Oscar Ostrum,* of Russell, was with him on the briefs for the appellees.

The opinion of the court was delivered by

PARKER, J.: This is an action to quiet title to real estate. The plaintiffs recovered and the defendants appeal.

All that needs to be said with respect to the pleadings is that they raise the issue whether defendants are still the owners of an undivided one-half interest in the minerals in and under the tract of land involved by virtue of a mineral deed conveying such an interest to the person from whom they acquired their interests for a term of fifteen years and so long thereafter as oil or gas was produced from the property in paying quantities or had lost ownership of, and title to, those interests by reason of cessation of production of oil from the land after expiration of the primary term of the instrument on which their claim of title is based, with the result their right, title and interest reverted to the original grantors.

The case was commenced on September 4, 1946, and submitted to the trial court on January 27, 1947, by agreement. Thereafter, for sound reasons not here important, the cause was taken under advisement until April 16, 1947, when it came on for decision. The

findings of fact made by the trial court on that date so adequately portray the factual picture revealed by the record they can be quoted at length in lieu of a statement of facts in which needless repetition could only ensue. When first made, after all parties had adduced their evidence, such findings read:

"1. On November 2, 1927, Alta C. Whitson, a widow; Ralph Whitson and Ward Whitson, single men; Lorraine Wilson and Ross C. Wilson, her husband, as grantors, made, executed and delivered to H. E. Holm, as grantee, a mineral deed conveying an undivided one-half interest in and to all of the oil, gas and other minerals, in and under, and that may be produced from the following described land, situated in Russell County, Kansas, to-wit:

" 'The Southwest Quarter of Section 16 Township 11 South, Range 15 West of the 6th P. M.'

"for a period of 15 years and as long thereafter as oil or gas, or both, are produced in paying quantities, which deed was filed for record December 3, 1927, and duly recorded in Book 7, at Page 604 in the Office of the Register of Deeds, Russell County, Kansas. That a full, true and correct copy of said mineral deed was admitted in evidence in this action by agreement.

"2. That thereafter H. E. Holm made various transfers and assignments of said interest and at all times pertinent to this action the defendants herein became and are the ultimate owners thereof.

"3. That during the years of 1933 and 1934 all of the owners of mineral rights in and to the South Half of the Southwest Quarter of Section 16, made, executed and delivered valid and existing oil and gas leases which leases were for a primary term of 10 years and for so long thereafter as oil and/or gas might be produced, which leases were owned as of September 25, 1945, by the defendant H. E. Holm and by C. M. Ashby, and that as of September 25, 1945, there was one producing oil well on this tract.

"4. That on or about September 24, 1945, water from what is known as the Dakota formation broke through the casing of said well which thereupon ceased to produce oil and commenced producing salt and mineralized waters, and which well was pumped by the pumper until about November 30, 1945, when the same was shut down because of such water.

"5. That Simon Lebow was the owner of oil and gas leases covering the following described lands and real estate, situated in Russell County, Kansas, to-wit:

" 'The Southeast Quarter of Section 17, and the Northeast Quarter of Section 20, all in Township 11 South, Range 15 West of the 6th P. M.,'

"upon which there were several producing oil wells and which oil wells are located immediately to the west and southwest from said land of the plaintiffs and that said Dakota water commenced flooding the oil producing horizon on the plaintiffs' land and the oil producing horizons belonging to said Simon Lebow which caused the said Simon Lebow damages to his wells.

"6. That on or about December 31, 1945, said Simon Lebow bought and purchased said oil and gas leasehold interest from the defendant H. E. Holm and the defendant C. M. Ashby and became the legal owner of said lease and

the material and equipment thereon which was purchased by said Simon Lebow for the sum of $1,500.00, which was about the salvage value of the equipment and material at the well.

"7. That after acquiring title to said leasehold from Holm and Ashby, Lebow pulled and removed all tubing and pumping rods from the well and caused cement to be injected into the well by Halliburton. That was a 'squeeze' job; the purpose being to force cement up on the outside of the casing to shut off the leaks therein.

"8. After a squeeze job, it is necessary that the cement be then drilled from the hole, preferably by a light drilling machine known as a spudder. Lebow *was unable* (did not) to get such a machine from January 1946, to October 1, 1946, and he conducted no further operations upon the land for the purpose of reconditioning said well or placing it back in production. (Emphasis supplied.)

"9. That during the month of May, 1946, the Summitt Oil Company, which had secured oil and gas leases on the north half of said quarter section, commenced the drilling of a well thereon for oil and gas purposes, and secured production therein on or about September 1, 1946.

"10. The tubing and pumping equipment taken from the well for the purpose of running cement therein were placed on the ground near the well where they remained until August, 1946, or later.

"11. That on or about July 18, 1946, C. R. Holland, an attorney for the plaintiffs, demanded a release of the leases owned by Simon Lebow covering the South Half of the Southwest Quarter of said Section 16, claiming that said leases were forfeited by reason of the cessation of production from the oil well upon said 80 acres. This demand was in writing, and a copy thereof was introduced in evidence as Plaintiffs' Exhibit 4, to which reference is hereby made. Several telephone conversations between Simon Lebow and Mr. Holland followed, as a result of which it was agreed between the plaintiffs and Lebow that if the latter would execute a release of his oil and gas leases on the South Half of the Southwest Quarter of said section, that the plaintiffs would execute and deliver to him a new lease covering said 80 acres, which new lease was to be for a period of one year from August 1, 1946, and as long thereafter as oil and/or gas might be produced, and wherein it was provided that Simon Lebow was to drill a second well upon said land within one year or abandon the lease. At this time the Summitt Oil Company was drilling a well upon the north 80 acres, which had not then been completed.

"12. That on August 26, 1946, Simon Lebow executed a release in writing of his leases on the South Half of said Southwest Quarter, and recited therein that 'The owners of said land are entitled to a release of said oil and gas leases by reason of the fact that the primary terms thereof have expired, and no operations for the production of oil and gas have been conducted since on or about February 1st, 1946.' It was further recited in said release that the consideration thereof is One Dollar. However, the Court finds that the real consideration for the execution thereof was an agreement on the part of the plaintiffs to execute a new lease to said Lebow, which lease had prior to the execution of said release been executed and placed in the hands of said Lebow.

"13. That at the time the notice of forfeiture was given to Simon Lebow,

he was then negotiating for the sale of an undivided one-half interest in the original leases and others to the Sohio Petroleum Company, which sale was completed on or about September 1, 1946.

"14. That upon completion of the sale to Sohio Petroleum Company, Lebow and said Company immediately started work upon the well, which had been shut down as hereinbefore stated, and at the time of the hearing of this case on January 27, 1947, had expended approximately $9,000.00 upon such repairs.

"15. That when the repairs upon said well are completed, the well should produce in paying quantities.

"16. That said oil well which is the subject matter of this action, *has been since its completion and* is now *and has been at all times* a well capable of producing oil in paying quantities, subject only to the maintenance, repair, upkeep and shut-down periods commonly required of all oil wells. (Emphasis supplied.)

"17. The main purpose of Lebow in purchasing the well on the Whitson lease was to protect his wells on the adjacent land which were being damaged by the escape of salt water into the oil producing sand through the casing of the Whitson well. When the former owners of the Whitson well were told by Lebow that they must plug or abandon the well, they chose to sell it to him for about the value of the equipment in the well.

"18. The primary term of the mineral deed of November 2, 1927, expired in 1942, and the rights of the defendants under this instrument were only kept alive thereafter by the production from the Whitson well on said quarter section. This well was shut down on or about November 30, 1945. Only a trace of oil was produced in November, 1945, and none in October of that year. Except for such a trace, no oil has been produced from the well from September 25, 1945, to the date of this hearing, to-wit, January 27, 1947; and no effort was made to put the well back in production until sometime after September 1, 1946."

Along with the foregoing findings the trial court made conclusions of law which, it will be observed, included not only questions of law but additional factual findings as well. They read:

"1. The period of shutdown of the well constituted an unreasonable length of time in which no production was obtained from the well. During such period no person was taking any active interest in seeing that production was resumed.

"2. The rights of the parties under the deed of November 2, 1927, are independent of their rights with any lessee. The fact that the Lebow lease was cancelled after the well had been shut down for more than 7 months, and under the circumstances herein found, would not fulfill the terms of the deed that the rights of the grantees should exist only so long as oil or gas, or both, are produced in paying quantities.

"3. A court of equity has no power to extend the term which the parties themselves have fixed by their written contract. The rights of the defendants under the deed were to endure for 15 years and as long thereafter as oil or gas, or both, are produced in paying quantities. The well ceased to produce,

not temporarily but permanently, for more than 9 months prior to the institution of this action. When production stopped, the conveyance was, by its terms, terminated.

"4. Upon the termination of the conveyance, the rights and interests of the defendants under the mineral deed of November 2, 1927, reverted to the plaintiffs herein.

"5. The title to the mineral interests conveyed under the mineral deed of November 2, 1927, should be quieted in the plaintiffs as against the defendants and all persons claiming through, by or under them or any of them."

In due time, in fact on the same day, defendants filed a motion asking that the findings of fact as made be amended to include seven additional findings. All of these requested findings were rejected except the third which was adopted and included as one of the court's findings. It reads:

"3. That as a part of the consideration for the release of the lease by Lebow, plaintiffs represented to Lebow that he would avoid a suit for forfeiture thereof."

Thereupon plaintiffs requested a modification of paragraph eight of the findings, and that paragraphs fifteen and sixteen thereof be either modified or set aside entirely. After consideration of this request the trial court modified paragraph eight by striking out the words "was unable" and inserting in lieu thereof the words "did not." It also modified paragraph sixteen by striking therefrom the words "has been since its completion and" and the words "and has been at all times." It refused to modify or make any change in paragraph fifteen.

Following the action just mentioned which, in an effort to avoid possible confusion, we point out resulted in deleting from the findings as quoted all language emphasized by underlining and the inclusion therein of the words supplied in parentheses together with defendants' requested additional finding previously quoted, the plaintiffs moved for judgment upon the findings of fact and conclusions of law. That motion was sustained and judgment was rendered quieting plaintiffs' title. Defendants' then filed a motion for new trial. When it was overruled they perfected this appeal.

Before consideration of controverted issues it should be stated that in this state a deed, conveying oil and gas in place for a fixed term of years and so long thereafter as either or both are produced in paying quantities, creates a base or determinable fee and that title to the estate so created vests immediately upon the execution and delivery of such an instrument but remains defeasible in the

event of cessation of production (*Richards v. Shearer,* 145 Kan. 88, 91, 92, 64 P. 2d 56).

We turn now to grounds relied on by appellants for reversal of the judgment.

It is first urged the court erred in not sustaining a motion for judgment on appellees' opening statement. This claim can be disposed of by stating that an examination of the record fails to reveal counsel in making such statement admitted facts which precluded appellees' right of action as set forth in their petition.

In *Stewart v. Rogers,* 71 Kan. 53, 80 Pac. 58, we held:

"The statute authorizing a party upon whom rests the burden of the issues briefly to state his case and the evidence by which he expects to support it is permissive only. He may or may not make such statement, at his own election. The issues are made not by such statement but by the pleadings. If a party elect to make such statement, and there be a substantial variance between it and his pleading, it is not a sufficient ground upon which to base a motion for judgment in favor of the opposite party, unless such statement in effect admits facts which preclude the party's right of action or defense as stated in his pleading." (Syl. ¶ 2.)

To the same effect are *Brashear v. Rabenstein,* 71 Kan. 455, 80 Pac. 950, and *Speer v. Shipley,* 149 Kan. 15, 85 P. 2d 999.

Next it is claimed that a demurrer to appellees' evidence should have been sustained. It is predicated upon the theory appellees' only testimony as to cessation of production came from three or four witnesses who merely stated they had not noticed any activity on the lease in question from January, 1946, to September, 1946. Assuming, but not conceding, this was the extent of appellees' evidence appellants supplied any possible deficiency therein by their own witness Lebow, who testified there had been no oil produced on the lease from the well in question from October, 1945, to September, 1947. In that situation our decisions are to the effect the ruling on the demurrer if erroneous was cured. (See *City of Garnett v. Dowis,* 144 Kan. 484, 61 P. 2d 913; *Hayes v. Reid,* 145 Kan. 51, 64 P. 2d 19; *Waldner v. Metropolitan Life Ins. Co.,* 149 Kan. 287, 288, 87 P. 2d 515; *Rush v. Brown,* 153 Kan. 59, 109 P. 2d 84; *Lechleitner v. Cummings,* 159 Kan. 171, 152 P. 2d 843).

What has been heretofore treated brings us to the crux of this lawsuit. However, the problem it presents will be simplified by first making reference to certain points which although they may appear to have some significance on a casual reading of the record are actually of little importance to its decision.

The record may perhaps suggest this is a case where it is strenuously urged there was no evidence to support the findings on matters particularly vital to factual questions pertaining to stoppage of production. Not so as to the trial court's pure findings of fact. While it is true appellants indicate such findings are not to their liking they do not specify error in their rendition. We might add that had they done so their action in that regard would have been futile. Our examination of the entire record reveals some substantial competent evidence to support them. That, under our decisions, is all that is required (*Pearcy v. Williams,* 163 Kan. 439, 183 P. 2d 243).

An additional inquiry might arise because of finding 9 to the effect the lessee of the north eighty had brought in a producing well on September 1, 1946. That fact has no bearing in this lawsuit. The test here is whether production, as contemplated by the deed, from the only well on the land prior to that date had stopped. If it had subsequent production would not extend the term or revive rights which the parties themselves had definitely fixed by their contract (*Kahm v. Arkansas River Gas Co.,* 122 Kan. 786, 253 P. 2d 563; *Ratcliff v. Guoinlock,* 136 Kan. 149, 12 P. 2d 798).

See, also, *Shenk v. Stahl,* 35 Ind. App. 493, 74 N. E. 538, holding that where a lease for so long as land is used for oil and gas well is terminated because of the cessation of such use, it is not revived by a subsequent discovery of oil and gas even though it be in the same well.

Upon disposition and elimination of the matters previously discussed it becomes apparent the really vital issue presented for appellate review is whether, within the meaning of the language used by the parties in the habendum clause of their deed, the record discloses such a cessation of production of oil as to result in a defeasance of the estate acquired and held by the appellants under the terms of the instrument conveying them their right, title and interest therein.

Counsel for both appellants and appellees assert they have found no decision involving the construction of a mineral deed of the type here involved. Of a certainty their assertion is correct so far as our decisions are concerned and after extended research, we confess, that if there are cases in other jurisdictions dealing with a similar conveyance we have failed to find them. There are, however, many authorities dealing with identical language when used in the haben-

dum clause of an oil and gas lease. These decisions, because of the rule in this jurisdiction that an oil and gas lease conveys no interest in land described but is personal property—an incorporeal hereditament—a profit *a prendre* (*Connell v. Kanwa Oil Inc.*, 161 Kan. 649, 170 P. 2d 631), are not decisive of the case at bar. Nevertheless, they indicate the force and effect to be given such language in contracts limiting the duration of interests or rights in personalty, and are therefore entitled to consideration and highly persuasive in the construction of similar language when found in instruments conveying title to realty.

Unquestionably, when the primary term of an oil and gas lease has expired and it is being held after expiration of the definite term upon production only the rule is that all rights under such lease terminate if and when production of oil in paying quantities ceases (Mills and Willingham, Law of Oil and Gas, p. 121 § 73; 2 Summers on Oil and Gas, Perm. ed. 173, § 305; 24 Am. Jur. 586, § 77).

However, it is also true that a mere temporary cessation of production because of necessary developments or operation do not result in the termination of such lease or the extinguishment of rights acquired under its terms (see preceding citations, also *Wisconsin-Texas Oil Co. v. Clutter* [Tex. Comm. Appeal], 268 S. W. 921; *Watson v. Rochmill*, 137 Tex. 565, 155 S. W. 2d 783, 137 A. L. R. 1032; 43 L. R. A., n. s., note 848; 24 Am. Jur. 571, 586, §§ 63, 77).

Although the Texas decisions to which we have just referred deal with oil and gas leases their importance in the case at bar become particularly significant when it is pointed out that in that state (see 10 Thompson on Real Property, Perm. ed. p. 623, § 5573; *Stephens County v. Oil & Gas Co.*, 113 Tex. 160, 254 S. W. 290; 29 A. L. R. 566; *Scarborough v. New Domain Oil & Gas Co.* [Tex. Civ. App.], 276 S. W. 331), such leases are held to create an estate in land in the nature of a base or determinable fee.

Upon consideration of the foregoing authorities we see no sound reason why the general principles of law, heretofore stated, governing the construction of oil and gas leases containing habendum clauses providing the estate conveyed shall continue after the expiration of its primary term so long as oil or gas is produced in paying quantities, should not be applicable to the construction of a mineral deed containing identical or similar provisions.

While, as the trial court properly held, the rights of the parties are independent of their rights with any lessee, the legal criterion

being whether the estate created by the deed had terminated, it is interesting to note that were we confronted with a judgment canceling a lease that judgment, in view of the trial court's findings, would have to be affirmed unless our former decisions are to be reversed. Before citing cases a brief résumé of the facts will be helpful. It appears from the record that in the court below the factual issue presented under the controverted evidence was whether, when production stopped because of a flooding of water from the Dakota formation, the well was temporarily shut down for repairs as claimed by appellants or was permanently shut down with the idea that no attempt would be made to put it back on the pump as contended by appellees. As heretofore noted the appellants' principal witness conceded no oil had been produced from the well from October, 1945, to September, 1946. Without reviewing the evidence it can be said there was testimony from which the trial court could have found either way. The cold facts are that after hearing the testimony it believed the well had been actually abandoned for failure to produce oil in paying quantities with no intention of continuing production. It rejected claims to the contrary as an afterthought resulting from the activities of the Summit Oil Company on the north eighty and, for present purposes limiting its findings to the lease itself, found the fact to be, as stated in its conclusion of law No. 3, that "The well ceased to produce, not temporarily but permanently, for more than nine months prior to the institution of the action."

Thus in *Warner v. Oil & Gas Co.*, 114 Kan. 118, 217 Pac. 288, we held:

"Where an oil and gas lease by its terms is to last for a stated time and as long thereafter as oil or gas is produced thereon the voluntary suspension of production by the lessee after the lapse of the period fixed is a sufficient ground for its cancellation." (Syl.)

And in the opinion said:

"The three years had expired and the evidence warranted a finding, which the trial court must be deemed to have made, that the owners of the lease had voluntarily ceased production for a period of at least three months." (p. 119.)

To the same effect is *Bundy v. Ahrens*, 115 Kan. 818, 224 Pac. 899, which holds:

"In a suit to cancel an oil and gas lease the evidence is examined and held to support a judgment that no oil was being produced from the leased premises." (Syl.)

And on page 820 of the opinion states:

"While the court made no special finding the effect of his judgment is to hold that no oil was being produced from the lease. When a well, during a period of a year and a half, does not produce enough oil to take care of the evaporation in a closed tank, or to keep the pump rods oiled, a court is justified in holding that it is not producing oil."

In *Kahm v. Arkansas River Gas Co.*, supra, we upheld a judgment quieting plaintiffs' title and canceling a lease where production had ceased for a six-month period notwithstanding evidence to the effect cessation of production of gas had resulted from lack of a pipe line and that as soon as a market was obtained a well could again be made to produce, stating at page 791 of the opinion that "a court of equity has no power to extend a lease beyond a term which the parties themselves have fixed by their written contract."

See, also, *Elliott v. Oil Co.*, 106 Kan. 248, 187 Pac. 692, and *Caylor v. Oil Co.*, 110 Kan. 224, 203 Pac. 735, upholding cancellation of leases for failure to produce under the facts and circumstances there involved.

Having determined the trial court's judgment would have been proper if based upon an oil and gas lease, can it be said that its decision the mineral conveyance had terminated is erroneous? Let us see.

In holding the rule, that temporary cessation of production for necessary developments or operation does not terminate a lease, is equally applicable to a deed we simply recognize the principle, often stated, that a deed must be construed in accord with the intent and purpose of the parties after it has been examined in its entirety. See *Bennett v. Humphreys*, 159 Kan. 416, 155 P. 2d 431, and *Epperson v. Bennett*, 161 Kan. 298, 167 P. 2d 606. Less recent decisions dealing with the same subject may be found in West's Kansas Digest, "Deeds," § 93, and Hatcher's Kansas Digest, "Deeds," § 30.

Obviously, since production under a lease depends in the first instance upon action or inaction on the part of the lessee and since the ultimate test as to whether an estate created by a deed has terminated depends entirely upon its own provisions, it must follow that the parties to a mineral deed, providing the estate conveyed to the grantees shall continue so long as oil is produced in paying quantities, do not contemplate that failure of a lessee to produce oil in paying quantities works a defeasance *ipso facto*. To hold

otherwise would mean that failure of the lessee to so produce because of neglect, poor judgment, fraud, connivance with the owners of other mineral interests, voluntary abandonment of the lease, or any unjustifiable reason over which the grantees had no control, would have that result. That, however, does not mean that owners of mineral interests can sit idly by and do nothing when the lessee ceases to operate or production stops for any other reason. Neither does it mean, as appellants contend, that any cessation which is resumed at some future date cannot be deemed permanent but must be construed as temporary for that construction would result in a nullification of the defeasance clause itself. We believe proper construction of such an instrument requires the conclusion that if for any reason there is a cessation of production of oil in paying quantities on the land covered by its terms the owners of the minerals in place are required to move promptly and by their efforts actually establish that such cessation, regardless of its cause, is temporary, not permanent. In the event of their failure to do so, it is our view production as contemplated by the parties is to be regarded as having ceased, their conveyance terminates and any estate theretofor held by them under and by virtue of its terms reverts to the grantors.

Having determined the proper construction to be given a mineral deed containing an habendum clause to the effect the estate conveyed to the grantees shall continue for a fixed term and so long thereafter as oil or gas in paying quantities is produced from the land, it remains for us to determine whether under the facts disclosed by the record in the instant case the judgment, holding rights acquired by the appellants under the deed in controversy had reverted and quieting appellees' title to the real estate therein described, is to be sustained. With the rule of construction established we need not labor that question unduly. We are convinced that with evidence to support the factual findings; that except for a trace no oil was produced from the well from September 25, 1945, to January 27, 1947; that from September 25, 1945, to September 1, 1946, no effort was made by any one, including the appellants, to put the well back in production; that during such period no person took any active interest in seeing that production was resumed; to say nothing of other supporting evidence to be found in the record, the trial court was justified in concluding the well had ceased to produce not temporarily but permanently for more than 9 months and that the period of its shut down constituted an unreasonable

time, with the result appellants' rights under their mineral deed had terminated and reverted to appellees. It follows its judgment quieting appellees' title to the mineral interests conveyed to appellants under such instrument was proper.

This case, except for the importance of the issue therein involved to the oil industry of this state, has already received more attention in this opinion than its merits deserve. For that reason, several claims of error advanced by the diligent counsel for appellants have not been mentioned or discussed. It will suffice to say they have all been given consideration and do not require a reversal of the trial court's judgment.

The judgment is affirmed.

BURCH, J., dissents.