(571 P.2d 338)
No. 48,554

KELWOOD FARMS, INC., *Appellant,* v. CHARLES S. RITCHIE, *et al.,*
*Appellees.*

Opinion filed July 22, 1977.

*Carl W. Shewmaker,* of Eureka, for the appellant.

*John E. Sanders,* of Chase, Myers & Sanders, of Eureka, for the appellees.

Before SPENCER, P.J., ABBOTT and SWINEHART, JJ.

SPENCER, J.: In an action to quiet title, plaintiff Kelwood Farms, Inc. as the owner of real estate in Greenwood County, Kansas, seeks termination of an oil and gas lease claimed by the defendants, C. Stewart Ritchie, III, Jeanette S. Ritchie, and Alice T. Ritchie; a further judgment barring the defendant Charles S. Ritchie from any interest in the minerals in place; and allowance of statutory damages and attorney fees under the provisions of K.S.A. 55-202. Judgment was entered for defendants and plaintiff has appealed.

The oil and gas lease in question, dated July 24, 1920, and known as the "Fee" lease, contained the following language:

"It is agreed that this lease shall remain in force for a term of Five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

and was operated by Charles S. Ritchie for his co-defendants. The interest in minerals in place claimed by the defendant Charles S. Ritchie was created by a conveyance dated January 2, 1964, from one Dewey F. Weaver and wife, and is as follows:

"Reserving, however, unto Dewey F. Weaver all oil, gas, and other minerals in and under said land for a period of ten years from the date hereof, and reserving unto Dewey F. Weaver an undivided ½ interest in and to the oil, gas and other minerals in and under said land for as long after January 2, 1974, as oil or gas is continuously produced in commercial quantities."

This interest was conveyed by the Weavers to the defendant Charles S. Ritchie on May 16, 1972. From that date until January 2, 1974, Charles S. Ritchie was the operator of the lease and the owner of all of the minerals in place. After January 2, 1974, his claim is to an undivided one-half interest in the minerals in place. This case was filed January 10, 1974.

The case was tried to the court on May 1, 1975. After consideration of the matter and the briefs submitted by counsel, the trial court made findings of fact which are incorporated in the journal entry of judgment. Facts so determined which are deemed material on this appeal are as follows:

"12. Prior to the institution of the lawsuit, production of oil and gas, within the meaning of the lease and the mineral reservation, ceased for an unbroken period of time from July, 1972 to February, 1974. . . .

"13. The subject leasehold is also known as the Fee Lease, and consists of four wells which are each referred to by number herein. Further, as with most of the oil fields in this area, they are characterized as 'stripper' wells.

"14. The evidence presented at the time of trial with respect to the actions taken by the defendant upon the cessation of production can best be presented by considering what, if anything, has been done by the defendant with respect to each particular well. Considering them in inverse order, I find as follows:

"a. Well No. 4. This is also referred to as the east offset to Maclaskey, and it also is referred to at times as the north well. The testimony was that it was shut down in June, 1972 when water from other formations broke through. At that time it had been making ten barrels a day. On June 29, 1972, defendant brought a Cardwell mobil hoist to the well for the purpose of performing a squeeze job. On July 1, 1972, defendant had the well logged and had to shoot off the tubing. On July 5, 1972, he moved in cable tool rig to drill out the bottom part of the packer, which operation continued for approximately three weeks. Late in July or the first

week of August, 1972, he put in a cement plug in the bottom and called in United Cement Company to squeeze it. After this, the driller and his crew went to Missouri, and defendant had to wait for a new crew to drill out the plug. Nothing further was done until October of 1973, at which time the defendant found a new crew and resumed work. His testimony was that there were no cable tool drillers available between the first week in August, 1972, and October of 1973; and that cable tool drilling is a specialized occupation. No evidence was presented by the plaintiff to contradict this testimony as to the availability of cable tool rigs in this area. In November, 1973, defendant swabbed out the oil and put it in the tank, just before putting in a new plug. They set a new plug down where the old one had been. During this period it was rainy, snowy and muddy (October to November, 1973). In January or February, 1974, they tried to put it on the pump, but the new squeeze job and plug did not hold. In February, 1974, defendant stopped working on it because they had to drill it out and run new tubing. There was no one available to do it and also there was no tubing available. There has not been any new tubing available since then according to the testimony of the defendant.

"b.   Well No. 3. In August, 1973, defendant put new foreign tubing in the well. He purchased approximately 1,000 feet at 90 cents a foot for a total cost of $900 to $1,000. The well was chemically treated, and as a result, it ate a hole in the casing creating the same situation as with Well No. 4. Defendant testified that it needs a new packer and new tubing. It could be put in production in three or four days time. At the time it went down, it was making approximately three and one-half barrels a day.

"c.   Well No. 2. From August, 1972 to August, 1973, the defendant testified that he spent much time and effort trying to recore in the Kansas City and Lansing Limestone formation which is higher up in the hole about 600 feet. He stated that this well needs larger tubing (2½ inch tubing) which isn't available. It will produce with new tubing. Defendant estimates it could make approximately ten barrels a day.

"d.   Well No. 1. This well pumped until July, 1972, when it was voluntarily shut down by the defendant following the break down on Well No. 4, which had quit in June, 1972. The reason given by the defendant was that the low price of oil, i.e., $2.40 a barrel when the well was making about 3½ barrels a day was not profitable. In November, 1973, defendant started working on it. It needed to be cleaned out, acidized and needed new tubing. It has been producing since February, 1974. Sometime after February, 1974, it developed a hole in the tubing. Defendant testified that enough tubing has been taken from the other three wells to replace the tubing in No. 1. Further stated that No. 1 does not need as good a tubing as the other three wells because of lower hole pressure. Testified that out of 6,000 feet of tubing pulled from the other wells he had salvaged 1980 feet of usable tubing.

"15.   The electric service furnished by Kansas Power & Light Company for the operation of the claimed leasehold estate was discontinued at the request of Charles S. Ritchie, the operator, on August 9, 1972, and no electric service was furnished to the subject leasehold estate thereafter until the 5th of February, 1974, when the meter, which had been removed six months after service was discontinued, was reinstalled.

"16.   Defendant in his testimony estimated that the four wells were capable of

producing twenty barrels of oil a day resulting in an estimated profit of $50,000 a year. Plaintiff offered no evidence to refute the production capability of the lease, nor any evidence as to whether a prudent operator would continue operating the lease under existing circumstances.

"17. Defendant has expended in excess of $6,000 in 1972 and '73 in efforts to repair the wells and restore the production on the lease. Most of these efforts were expended prior to September, 1972 and beginning again in October of 1973..

"18. The reason for the relative inactivity on the lease from August, 1972 until October, 1973, as admitted by defendant, was the unavailability of drilling crews; the low price of oil (ranging from $2.65 to $2.85 per barrel in 1972, increasing up to $3.40 in the fall of 1973 when it began rising until the time of this trial when it was $12.00 per barrel); and the national, or at least regional, shortage of tubing in the oil industry.

"19. Defendant's testimony was that none of the operations or expenses incurred were attempts to salvage out or abandon the lease, and further it was shown that a full array of equipment, including pump jacks on each well, rods and tubing, storage tanks, disposal wells, and salt water pumps, well head equipment, lead lines, electric lines and poles, and various other oil field equipment, have remained on the lease at all times.

"20. Mr. Grooms, local oil field producer and oil field supplier, testified that they started having trouble getting tubing in 1972 and 1973. That there was some new tubing in '74, but that there was no tubing in half of '73 and half of '74, and that he has not yet been able to get new tubing in '75. He also is the owner of stripper wells in this region and testified that during 1972 and 1973, because of low oil prices, the only money he has spent for improvements on his wells was what he had left at the end of each month. Prior to the increase in oil, he characterized the financial picture for oil industry in Greenwood county as very poor, and stated that the wells he had purchased had been dropped by other people because they could not be produced at a profit."

## The court concluded in part as follows:

"5. Keeping in mind that these were stripper wells; that the operation of stripper wells during this period of time were low margin, due to the price of oil; the unavailability of crews; and the unavailability of tubing, the defendant has shown reasonable diligence, good faith and prudent management in re-storing production.

"6. Notwithstanding the showing of cessation of production for some seventeen months, coupled with a shut off of electricity for a similar period, it is the conclusion of the court that under the circumstances set forth in No. 5 above, coupled with an expenditure in excess of $6,000, as well as the maintaining of a full array of equipment on the lease throughout the period of time in question, negates any showing of an intent to abandon the lease. On the contrary, it leads the court to the conclusion that the cessation of production was temporary and not permanent."

Judgment was entered accordingly and the costs were assessed three-fourths to the plaintiff and one-fourth to the defendants.

At this point it should be noted that, at the time of oral

argument before this court, counsel for both sides were in agreement that, with respect to the type of instruments here involved, no distinction is to be drawn between the phrase "produced in commercial quantities" and the phrase "produced in paying quantities." Although neither phrase is found in the oil and gas lease, we have no hesitancy in adding that all rights under that instrument terminate when production in paying quantities ceases. *Brack v. McDowell,* 182 Kan. 368, 320 P.2d 1056.

The trial court held, and we think properly so, that the general principles of law set forth in *Wilson v. Holm,* 164 Kan. 229, 188 P.2d 899, control the issues involved in this litigation. It was there stated:

". . . [W]e see no sound reason why the general principles of law, heretofore stated, governing the construction of oil and gas leases containing habendum clauses providing the estate conveyed shall continue after the expiration of its primary term so long as oil or gas is produced in paying quantities, should not be applicable to the construction of a mineral deed containing identical or similar provisions." (164 Kan. at 237.)

It was there noted that when the primary term of an oil and gas lease has expired and it is being held after expiration of the definite term upon production only, the rule is that all rights under such lease terminate if and when production of oil in paying quantities ceases; but also:

"However, it is also true that a mere temporary cessation of production because of necessary developments or operation do not result in the termination of such lease or the extinguishment of rights acquired under its terms. . . ." (164 Kan. at 237.)

The recent case of *Reese Enterprises, Inc. v. Lawson,* 220 Kan. 300, 553 P.2d 885, held that the determination of whether an oil and gas lease is producing in paying quantities under a thereafter clause is to be made by an objective standard upon mathematical computation. In that case the lessee attempted to show continued production and relied on his efforts to further develop the lease. There was no claim by the lessee of temporary cessation of production. The court noted that the action was one to determine the continued validity of the lease under its own terms and not an equitable action to declare the forfeiture of an existing lease. With this distinction in mind, the court restated the rule that a court of equity has no power to extend a lease beyond the term which the parties themselves have fixed by their written contract. (220 Kan.

at 309.) The exception for temporary cessation of production recognized in *Wilson v. Holm,* supra, was not dealt with in *Reese Enterprises, Inc. v. Lawson,* supra, and remains a part of the law of this state.

The bottom line question here is whether the cessation of production was temporary or permanent. This is a question of fact for the trial court. (*Wilson v. Holm,* supra.)

Plaintiff does not challenge the findings of the trial court but does question whether those findings support the conclusion that the defendant Charles S. Ritchie has shown reasonable diligence, good faith and prudent management in restoring production, and whether that defendant's efforts on the leasehold estate were such as to negate any intent to abandon the lease and justify the conclusion that the cessation of production was temporary and not permanent, all as set forth in conclusions No. 5 and No. 6 hereinbefore related.

Is the conclusion of temporary and not permanent cessation supported by the considerations stated and/or the trial court's other findings of fact?

"Stripper wells" are wells which produce so small a volume that the gross income provides only a small profit, or sometimes does not even cover cost of production.

In *Wagner v. Sunray Mid-Continent Oil Co.,* 182 Kan. 81, 318 P.2d 1039, production ceased in October of 1953 because of excess water. An adjoining leaseholder purchased the lease with the idea of using it as a salt water disposal well. The prior owner had written him in response to his offer of purchase that it had decided to abandon the well. Thereafter, in April of 1954, the new owner started reworking the well with the idea of producing. The trial court phrased the question as whether the production had ceased with the idea no attempt would be made to put it back on pump. The supreme court affirmed a finding of permanent cessation noting that (1) when the well was shut down it was not a commercial well, (2) there was no production for eight months, and (3) for that period no one had the intention of starting production again.

In *Wilson v. Holm,* supra, production of oil was halted on September 24, 1945, when water broke through the casing. The well continued to pump, however, until November 30, 1945, when it was shut down because of the water. In December the

lease was assigned and the new lessee attempted a squeeze job which he did not complete because he did not secure a needed tool. Tubing and pumping equipment, although pulled from the well, were left at the lease. No other efforts were made to rework the well until September 1, 1946, when a new lessee purchased a new lease executed by the real estate and undivided one-half mineral estate owners in August of 1946. The supreme court, in affirming the trial court's finding of permanent cessation, noted (1) the conceded fact of no production for a nine-month period, and (2) the conflicting claims of "temporary shut down for repairs" and "abandonment for failure to produce in paying quantities with no intention to continue."

The earlier cases of *Caylor v. Oil Co.,* 110 Kan. 224, 203 Pac. 735, and *Kahm v. Arkansas River Gas Co.,* 122 Kan. 786, 253 Pac. 563, also affirmed trial court findings of permanent cessation. In *Caylor,* production ceased on a gas lease because of low pressure. Claims of inability to get fuel and workers and delays caused by muddy ground were said to be of no significance because of the express "thereafter" clause extending the lease "as much longer as oil or gas is found in paying quantities." However, it appears that as to the one well which shut down, there was no hope of renewed production and another well on the lease would have had to be developed. In *Kahm,* production ceased when the pressure of the pipeline into which the gas from the well was fed to market increased past that of the well, which had been decreasing by its natural processes. The lessee sought another pipeline on which to attach and/or a pumping device to increase the pressure so as to allow a renewed flow into the existing pipeline. Neither had been found at the time of trial on the action to cancel. The supreme court affirmed a trial court's cancellation, saying that there was no mere temporary cessation, that production had progressively dwindled and renewal was dependent on "various prospective but unassured projects."

We will not attempt here to review the evidence adduced at the trial with respect to the lessee's activities on the "Fee" lease beyond what is set forth in the findings of the trial court. Suffice it to say that under all of the Kansas authorities there was ample evidence for the trial court to have held the cessation of production on that lease to be either temporary or permanent. The facts here are quite similar to those in *Wilson v. Holm,* supra, and in

that case, as well as in *Wagner v. Sunray Mid-Continent Oil Co.,* supra, it was noted that there was evidence "from which the court could have found either way" and "there was testimony from which the district court could have found for either party." The question remains one of fact to be determined by the trial court. (*Wilson v. Holm,* supra.)

Plaintiff argues that the test is not whether there is an intention to abandon, but whether the lease and the term mineral interest have terminated by their own terms. This is recognized, but both *Wilson* and *Wagner* looked to the intention of the operator at the time of shut down as a factor in the determination of whether cessation was temporary or permanent.

It is also of note that the trial court entered a finding of fact that Ritchie estimated the wells were capable of producing twenty barrels a day and that plaintiff offered no evidence to refute this production capability. This finding would seem to indicate that the ability to produce from the lease is a factor. Such is not the case. In *Wagner,* it is said that "when a mineral deed has terminated because of cessation of production, it is not revived by subsequent production of oil even though it be in the same well." (182 Kan. at 89.) Along these lines, defendants argue incorrectly that "[p]erhaps the best evidence [of temporary cessation] is the results which have been accomplished by the time of the trial," and they point to the renewed production in well No. 1, which is the only well clearly shown by the evidence to have been voluntarily shut down for an indefinite period. Such renewed production on that well does not help their cause.

In 2 Williams and Meyers Oil and Gas Law, § 334.8, p. 164, it is said that at least three kinds of evidence are relevant to the question of temporary or permanent cessation: "(1) The period of time cessation has persisted; (2) the intent of the operator; and (3) the cause of the cessation." Here the period was seventeen months. This is a longer period than in either *Wilson* or *Wagner.* In *Beatty v. Baxter,* 208 Okla. 686, 258 P.2d 626 (1953), the period was almost two years, yet the cessation was found to be temporary. In that case there was evidence that the operator did not intend to abandon production, as he did not pull casing and he resumed as soon as material became available. Thus, it has been said that "no one element can be isolated and held decisive in determining cessation to be permanent or temporary.  .  .  ." (2

Williams and Meyers Oil and Gas Law, § 334.8, pp. 164-165, n. 12.) In the present case, it is clear the trial court believed the intention of the operator to be a temporary shut down because of water seeping in and a breakdown of equipment.

The plaintiff has specified five points on appeal but the one vital issue here to be determined is whether the cessation of production of oil from the "Fee" lease was such as to justify termination of the oil and gas lease and the reversion of the interest in the minerals in place.

There is competent evidence to support a finding of either temporary or permanent cessation and the trial court, after full consideration of the evidence, was drawn to the conclusion that the cessation of production was temporary and not permanent. As there is substantial competent evidence to support this finding, it is of no consequence that there may have been contrary evidence adduced which, if believed, would have supported a different finding. (*Rush v. King Oil Co.*, 220 Kan. 616, 556 P.2d 431.)

It follows that the trial court did not err in entering judgment for the defendants, denying relief under K.S.A. 55-202 and assessing costs.

Judgment affirmed.