No. 51,943

Texaco, Inc., a corporation, William S. Post, Walter I. Post, Etta Beatrice Geiman, Fannie Wood, Celia Ivers Whelihan, Elsie G. Post, Jerry L. Post, Larry J. Post, and Marjorie Gearhiser, *Appellants,* v. Wendell B. Fox and Mildred V. Fox, husband and wife, *Appellees.*

(618 P.2d 844)

Opinion filed November 1, 1980.

*Jack M. Short,* of Tulsa, Oklahoma, argued the cause and was on the brief for the appellant Texaco, Inc., and *Gerald C. Golden,* of Meade, argued the cause and was on the brief for the appellants, William S. Post, Walter I. Post, Etta Beatrice Geiman, Fannie Wood, Celia Ivers Whelihan, Elsie G. Post, Jerry L. Post, Larry J. Post, and Marjorie Gearhiser.

*Harold K. Greenleaf, Jr.,* of Smith, Greenleaf & Brooks, of Liberal, argued the cause and *David J. Wilson,* of Wilson, Beard & Good, of Meade, was with him on the brief for the appellees.

The opinion of the court was delivered by

Herd, J.: Texaco, Inc. et al. brought a declaratory judgment action against Wendell B. and Mildred V. Fox seeking a judgment declaring its oil and gas lease to be in full force and effect and

enjoining the defendants from interfering with Texaco's right of ingress and egress to the leased acreage. The petition also sought equitable relief as the court deemed proper. The case was tried to the court which quieted defendant's title to certain mineral interests and cancelled Texaco's oil and gas lease for improper payment and for nonpayment of royalties to Fox, for failure to reasonably develop the leasehold estate and for failure to obtain production in commercial quantities. Texaco appeals.

Briefly stated, the pertinent facts are as follows. On July 15, 1946, Alonzo Orla Ivers, Celia Ivers and Adda Ivers Post executed a warranty deed to Wendell B. Fox conveying the following described real estate in Meade County, Kansas, to-wit:

"The Northeast Quarter (NE4) of Section Thirty-two (32), and the Southwest Quarter (SW4) of Section Thirty-three (33), Township Thirty-three (33) South, Range Twenty-nine (29) West of the 6th P.M."

The deed contained the following reservation:

"Except that there is hereby reserved to the grantors, their heirs and assigns all of the oil and gas royalty in and under said real property for a term of twenty (20) years from date of this conveyance, unless oil and/or gas is produced from said property in commercial quantities during said twenty-year term, and in such event the oil and/or gas royalty reservation shall continue as long as oil/or gas is produced in commercial quantities  .  .  .  ."

On August 21, 1951, Adda Ivers Post, Alonzo Orla Ivers and Celia Ivers, Henry Blair Cooper, as trustee for Benjamin N. Kneeland, under the last will and testament of Mary Laurinda Kneeland, deceased, Benjamin K. Kneeland and Gladys Kneeland, as lessors, granted Texaco an oil and gas lease on the described real estate "for a term ending August 21, 1956, and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them is produced." The lease also contained the following provision:

"Notwithstanding anything in this lease contained to the contrary, it is expressly agreed that if lessee shall commence drilling operations at any time while this lease is in force, this lease shall remain in force and its terms shall continue so long as such operations are prosecuted and, if production results therefrom, then as long as production continues."

On December 20, 1951, Adda Ivers Post conveyed to Wendell B. Fox an undivided 1/12th of the landowner's share of the oil, gas and other minerals produced and saved from said lands, to continue for 20 years from July 15, 1946, and as long thereafter as

hydrocarbons are produced in "commercial quantities." On January 7, 1952, Alonzo Orla Ivers and Celia Ivers made an identical conveyance.

The defendants ratified the oil and gas lease on January 10, 1952, by separate instrument stating they "did ratify, approve, confirm, and adopt" Texaco's oil and gas lease and acknowledged the same to be in full force and effect according to the terms and provisions of the lease.

Texaco commenced drilling an oil well within the primary term of the lease and completed Fox #1 well as an oil producer on September 28, 1956. Fox #2 well was completed on December 21, 1956. Fox #3 well was completed on December 27, 1957; and Fox #4 well on August 28, 1959. All four wells were oil producers and are located on the Northeast Quarter (NE4) of Section Thirty-two (32). Wells #1, #3 and #4 were shut-in on June 3, 1964, May 20, 1971, and June 10, 1968, respectively. None of the shut-in wells have been plugged as they are prospects for secondary recovery. Fox #2 well has produced oil since its completion and is still producing.

During the latter part of 1976 and early 1977, Texaco resolved to test additional geological formations on wells #3 and #4. It contacted Fox, advising him of its desire to rework the wells. Fox refused to permit Texaco to re-enter the land, padlocked the gate and advised Texaco he considered the lease on the west 80 acres terminated. Except for an exchange of correspondence in 1968 in which Fox asked to be considered a bidder if the lease were ever abandoned and a later comment by Fox on low production under the lease, Texaco had no notice from Fox he considered the lease terminated.

Fox and his wife own 1/6th of 1/8th royalty in and under the real estate in this suit. They made no inquiry about the lack of production on Section 33 nor did they ask Texaco about the history of its operating expenses on the lease or claim the lease was not producing in paying quantities prior to commencement of this action.

Texaco filed suit February 24, 1978. Additional owners of the mineral reservation (designated "royalty reservation" in the deed) joined Texaco as plaintiffs. The case was tried to the court on December 5 and 6, 1978. The trial court held for the defendants, terminating both the lease and the mineral reservation, and found

the lease was not producing in commercial quantities and that Texaco had failed to reasonably develop the property subject to the oil and gas lease. After denial of post-trial motions this appeal followed.

Let us first determine whether there is any significance to the use of the term "commercial quantities" in the "thereafter" clause of the mineral reservation as distinguished from the usual term "paying quantities." Neither term is used in the oil and gas lease; however, we have held that the habendum clause of a lease is dependent upon continuing production of oil or gas. In *Kelwood Farms, Inc. v. Ritchie,* 1 Kan. App. 2d 472, 476, 571 P.2d 338 (1977), the court considered a lease containing language similar to that in the present lease and stated:

"Although neither phrase [produced in commercial quantities or produced in paying quantities] is found in the oil and gas lease, we have no hesitancy in adding that all rights under that instrument terminate when production in paying quantities ceases."

See also *Brack v. McDowell,* 182 Kan. 368, Syl. ¶ 2, 320 P.2d 1056 (1958); *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959).

The "thereafter" clause has the same meaning when used to create a separate estate or interest in oil and gas as when it is used in the habendum clause of an oil and gas lease. 1A Summers, Oil and Gas § 136 (rev. ed. 1954). See *Kelwood Farms, Inc. v. Ritchie,* 1 Kan. App. 2d 472; *Wilson v. Holm,* 164 Kan. 229, 188 P.2d 899 (1948). Having determined the habendum clause of an oil and gas lease and of a mineral reservation have the same meaning, we must determine whether the term "commercial quantity" is synonymous with the term "paying quantity." We accept the definition of commercial quantity from Williams and Meyers, Manual of Oil and Gas Terms (1957), which states at 37:

"A quantity of oil, gas or other minerals sufficient for production in paying quantities."

We hold the terms are synonymous.

The next issue is whether Texaco's lease was producing in paying quantities, thereby perpetuating the lease and mineral reservation.

Before determining whether the lease was producing in paying quantities, we must deal with appellant's contention regarding the accounting period. The trial court used Texaco's annual accounting statements for a thirteen-year period and made a

separate finding as to production for each year of the period. The court also added depreciation of equipment as a proper item of expense to determine the profitability of the well. Texaco argues the accounting period is too long and whatever the length, production in paying quantities should be determined from a cumulative review of the period, rather than a year by year comparison of profit and loss. Texaco also argues depreciation of equipment is not to be included. Although there is a general business custom of using fixed annual accounting periods for purposes of determining profit and for tax purposes, there is no reason production of oil and gas in paying quantities should be determined in that manner. We find the trial court erred in viewing each year individually rather than cumulatively. Regarding the 'thirteen-year period: it is generally accepted that profitability on an oil and gas lease should be determined over a relatively long period of time in order to expose the operation to the leveling influences of time. The arbitrary use of a short period of time while a well is down for a workover is obviously untenable. On the other hand, the use of an unreasonably long period would entail using past glories during flush production to determine a lease's present condition, which would give a distorted result not reflective of the current status of the lease. The better rule precludes the use of a rigid fixed term for determination of profitability and uses a reasonable time, depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease and thus to "provide the information which a prudent operator would take into account in whether to continue or to abandon the operation." See 2 Kuntz, Oil and Gas § 26.7(u) (1964); Annot., 43 A.L.R.3d 60-62. We find the thirteen-year accounting period was an unreasonably long period of time. That finding is, however, irrelevant in light of our determination of the depreciation issue. In *Reese Enterprises, Inc. v. Lawson,* 220 Kan. 300, Syl. ¶ 3, 553 P.2d 885 (1976), this court defined "paying quantities" as follows:

"It is generally accepted that the phrase 'in paying quantities' in the 'thereafter' provision (extension clause) of an oil and gas lease's habendum clause means production of quantities of oil or gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs, or equipping costs, are never recovered, and even though the undertaking as a whole may thus result in a loss to the lessee."

The court in *Reese* applied an "objective test" to determine production in paying quantities and we refer the reader to *Reese Enterprises, Inc. v. Lawson,* 220 Kan. at 313-315 for the court's discussion of that test.

In this case, the key to determining whether the lease was producing in paying quantities is whether depreciation of equipment is a proper item of expense in determining the profitability of the well. The equipment in this case is the original equipment.

Our attention is directed to a recent decision of the Oklahoma Supreme Court in *Stewart v. Amerada Hess Corp.,* 604 P.2d 854 (Okla. 1979), which held depreciation of equipment used in lifting operations should be included in determining whether there is production in "paying quantities." The court expressed its reasoning as follows:

"The rationale for this rule is that while depreciation of the original investment in the drilling of a well may not be *stricto sensu* an out-of-pocket lifting expense, production-related equipment does have value that is being reduced through its continued operation." p. 857.

We reject this rationale and find this question was directly answered in *Reese* where we stated all direct costs encountered are taken into account and the initial cost of drilling and equipping the well is not a part of those operating expenses. Our review of the profit and loss statements show that cumulatively viewing the entire thirteen-year period, if depreciation on equipment is not taken into account, the lease is producing in paying quantities and has been producing in paying quantities from its inception. Therefore, although the use of the thirteen-year accounting period was unreasonably long, the error is of no consequence, as any combination of years will show production in paying quantities.

Appellees have abandoned their allegation regarding breach of implied covenant to reasonably develop the lease and the issue is, therefore, not before this court.

Finally, appellees contend the royalties were either erroneously paid or improperly paid, constituting a breach of contract for which forfeiture of the lease is a proper remedy. This issue was neither plead nor proven. We therefore reject as erroneous that portion of the trial court's finding which terminates the lease because of the improper payment and nonpayment of royalties.

The judgment of the trial court is reversed and the lease and mineral reservation are held to be in full force and effect.