(644 P.2d 1342)
No. 52,581

R. D. WRESTLER and BETTY M. WRESTLER, *Appellees,* v. MACK C. COLT, *et al., Appellants.*

 Opinion filed May 20, 1982. 

*Carl L. Wettig,* of Wichita, and *John R. Toland,* of Iola, for the appellant Mack C. Colt.

*Charles F. Bennett,* of Chanute, for the appellees.

Before FOTH, C.J., presiding, TERRY L. BULLOCK, District Judge, and FREDERICK WOLESLAGEL, District Judge Retired, assigned.

FOTH, C.J.: Following a bench trial, the trial court found defendants' oil and gas lease on plaintiffs' land had terminated, ordered defendants to plug all wells on the land and awarded plaintiffs their attorney fees and costs. The order was based on a finding that the lease was not producing in paying quantities. Defendants appeal, contending: (1) There was no substantial competent evidence establishing that defendants' oil and gas lease was not producing in paying quantities; and (2) the lease termination and resulting order to plug wells violates public policy prohibiting waste of natural resources.

Defendants acquired the lease in question on September 23, 1942. It is known as the Blohm lease, and is one of several operated by defendants in what is called the "Colony Field" in Allen and Anderson counties. The Blohm lease had 53 wells, both producing and injection, drilled between 1947 and 1963. Secondary recovery through water flooding resulted in peak production in 1961 and 1962. Production then declined; flooding was stopped in 1968, and the three years before suit was filed produced only 100 barrels.

Defendants have been attempting various methods of tertiary recovery in the Colony Field since 1961. At the time of trial in October, 1979, their hopes were pinned on an experimental polymer injection project being conducted on a nearby lease. Whether the experiment will be successful would not be known for another two to three years. If it is successful (and we were advised at oral argument that the issue is still in doubt) it would be another year or two before the method could be utilized on the Blohm lease. It is unknown whether, if successful in the pilot project, it would also be successful on the Blohm lease. In any event, it would be yet another five months to two years before any effect on production from the Blohm lease could be noticed.

1. The term of the lease was "five years from this date, and as long thereafter as oil or gas, or either of them is produced [in paying quantities] from said land by the lessee." Although the bracketed phrase "in paying quantities" does not appear in the lease document, all parties agree it is included by legal implication. See *Reese Enterprises, Inc. v. Lawson,* 220 Kan. 300, 553 P.2d 885 (1976).

The legal standards for determining whether an oil and gas lease is "producing in paying quantities," after drilling has been accomplished and production established, are now well established.

A. In *Reese,* our Supreme Court stated the "objective" legal test in the following terms:

"[W]ill [the lease] produce a profit, however small, over operating expenses, after eliminating the initial cost of drilling and equipping the well or wells on the lease which are required to prepare the lease for production." 220 Kan. at 314.

B. In order to determine whether the required profit has been realized, the *Reese* court mandated the calculation of *income* and *expense* according to the following criteria:

"In arriving at the amount of income which has been realized, the lessee's share of production or his share of receipts from the sale of oil or gas is taken into account. More specifically, the income attributable to the working interest as it was originally created is taken into account, and only the lessor's royalty or other share of production is excluded. Thus, the share of production attributable to an outstanding overriding royalty interest will not be excluded but will be taken into account in determining income. (*Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774 [1959]; and *Transport Oil Co. v. Exeter Oil Co.,* 84 Cal. App. 2d 616, 191 P.2d 129 [1948].)

"Expenses which are taken into account in determining 'paying quantities' include current costs of operations in producing and marketing the oil or gas. Most of the costs so incurred are easily identified as being direct costs, and present no difficulty. In this connection the lessee is held accountable for the production of the lease as a prudent operator working for the common advantage of both the lessor and the lessee. *All direct costs encountered, whether paid or accrued, in operating the lease as a prudent operator are taken into account.* These direct costs include labor, trucking, transportation expense, replacement and repair of equipment, taxes, license and permit fees, operator's time on the lease, maintenance and repair of roads, entrances and gates, and *expenses encountered in complying with state laws which require the plugging of abandoned wells and prevention of pollution.*" 220 Kan. at 314-15. Emphasis added.

C. The proper length of the accounting period to be used in determining whether a profit has been realized was enunciated in *Texaco, Inc. v. Fox,* 228 Kan. 589, Syl. ¶ 3, 618 P.2d 844 (1980):

"In determining whether an oil and gas lease is producing in paying quantities, the proper accounting period is to be a reasonable time, depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease and thus provide the information which a prudent operator would take into account in whether to continue or to abandon the operation."

D. *Texaco* also established that depreciation on *original* oil and gas well equipment is not to be included as an item of expense in "paying quantities" calculations. 228 Kan. at 594.

E. Cessation of production in paying quantities, resulting in the termination of an oil and gas lease, must be permanent and not merely temporary. *Kelwood Farms, Inc. v. Ritchie,* 1 Kan. App. 2d 472, 571 P.2d 338 (1977). Further, as we said in *Kelwood:*

"Three kinds of evidence relevant to the question of temporary or permanent cessation of production are: (1) The period of time cessation has persisted; (2) the intent of the operator; and (3) the cause of cessation.

"Whether cessation of production is temporary or permanent is a question of fact to be determined by the trial court and such finding when supported by substantial competent evidence will not be disturbed on appeal." 1 Kan. App. 2d 472, Syl. ¶¶ 4 & 5.

F. Cessation of production in paying quantities is legally permanent, properly terminating the lease, where the only prospect of renewed production depends upon "the successful coordination of various prospective but unassured projects and possibilities." *Kahm v. Arkansas River Gas Co.,* 122 Kan. 786, Syl. ¶ 2, 253 Pac. 563 (1927).

The trial court, after findings of fact reviewing the evidence, entered the following mixed factual finding and legal conclusion:

"To avoid termination of the lease the lessee must operate the same to produce sufficient quantities of oil or gas which will produce a profit over operating expenses. Defendant Colt does not maintain records which would show operating expenses attributable to the Blohm lease only. I conclude, however, that oil has not been produced in paying quantities inasmuch as Colt testified that it would be economically impractical to produce any of the leases in the Colony Field individually. Further, it has been shown that for the 2 ½ year period immediately prior to the filing of the Petition less than 100 barrels of oil was produced from the lease. At the time of the filing of the lawsuit oil was selling at approximately $12.00 per barrel. Of the 53 wells on the lease, only four were producing. Continued operation of the lease without some form of tertiary recovery would require that the remaining wells be plugged pursuant to Kansas law. The cost of plugging such wells could range from $300.00 to $700.00 per well. In addition, other expenses of a prudent operator should be taken into account. These include labor, trucking, transportation expenses, replacement and repair of equipment,

taxes, license and permit fees, operator's time on the lease, maintenance and repair of roads, entrances and gates, and other expenses. (*Reese,* P. 314) Further, Colt has indicated in his testimony that further development of the Blohm lease is impractical unless the Polymer Project is successful. Throughout the testimony there is indication that Colt's desire to retain the lease is based upon the success or failure of the Pilot Project on the Keown lease. If the project is successful he plans to initiate an enhanced recovery project on the Blohm lease. (Although it is noted that his expert witnesses have not determined whether a Polymer Project would be successful thereon.) I can only conclude that at the time of the filing of the lawsuit production of oil on the Blohm lease was not in paying quantities as that phrase is defined under Kansas law. Colt's intentions with regard to the Blohm lease are at this time only speculative in nature, which speculation is to be avoided as stated in the Reese case."

The trial court then concluded that the cessation of production in paying quantities was permanent and found the subject lease had terminated by its own terms.

As previously mentioned, defendants contend the trial record lacks substantial competent evidence to support the trial court's fundamental conclusion that the lease was not producing in paying quantities. In this connection, defendant argues the trial court ignored uncontroverted evidence that the lease had yielded a small annual profit from 1974 through the first ten months of 1979. In our view, there are several fallacies in defendant's contention.

First, defendant's calculations of the "uncontroverted" profit are highly suspect. Defendants suggest one set of expense figures in their initial brief, and a different set in their reply brief. Defendant Colt's testimony on expenses was not only limited to vague estimates but was at best ambiguous. For example, his $50 figure for pump repair was eventually qualified as being "for each one." Whether this meant each well pulled or simply each well is not clear. In either event it adds at least $50 to the various expense figures relied on here and, as noted below, this item alone more than consumes the claimed profit.

Second, none of the various figures urged by defendant as correct take into account certain expenses—expenses admitted to exist, but indefinite in amount. These expenses include taxes, license and permit fees, maintenance and repair of roads, entrances and gates, and other expenses described by Colt as "little items." Figures in defendant's reply brief show a net profit for 1976 and 1977 of $11.00 per year, *before* taking into account these "little items." Inasmuch as "[a]ll direct costs encountered,

whether paid *or accrued,* in operating the lease as a *prudent operator* are taken into account," as the *Reese* court noted, we conclude that the trial court was entirely justified in finding that existing but unaccounted for expenses, whether paid or merely accrued, were greater than the marginal profit figure urged by defendant. 220 Kan. at 314. Defendant has not demonstrated that those expenses, again, conceded to exist, were less. On this record, defendants demonstrate no error.

Third, defendant's expense figures do not include the cost of plugging abandoned wells on the lease. The cost of plugging just one well would easily surpass defendant's slim annual profit estimate. Defendants do not contest their obligation to plug abandoned wells. They also concede such costs, whether incurred or merely accrued, are required to be included in production calculations. Defendants contend, instead, that the 49 non-producing wells on the subject lease are *not abandoned.* This argument hinges on defendants' alleged plans to attempt tertiary recovery from these wells at some unspecified date in the future. Undoubtedly, temporary cessations of production—whether for the purpose of changing production methods or some other purpose—would not warrant a termination of a lease such as the one before us. *Kelwood Farms, Inc. v. Ritchie,* 1 Kan. App. 2d 472. In our view, however, an oil and gas lessee, temporarily ceasing production, thereafter has only a reasonable time, under all the circumstances, to return the leasehold to production in paying quantities. Where renewed production depends, if at all, upon "various prospective but unassured projects and possibilities," termination is appropriate. *Kahm v. Arkansas River Gas Co.,* 122 Kan. 786, Syl. ¶ 2.

In the case at bar, defendants have no plan to attempt tertiary recovery on the lease in question unless and until the Keown lease Pilot Project, as yet incomplete, is successfully concluded. Even if that project is successful, it still will not be known whether the recovery method used there will be effective on the subject lease. It has now been approximately 14 years since active secondary recovery ended. Although estimates were made at trial, at oral argument here no definitive estimate could be given by defendant concerning when even the Pilot Project would be completed. Because tertiary recovery on the subject lease hinges, in part, on the success of that project, no reasonable estimate can

be given as to a date in the future for the renewal of production in paying quantities on the leasehold in question. On this record, we conclude, as the trial court did, that defendant's reasonable time to commence production had passed; that the wells were in fact abandoned; and that the substantial costs of plugging these wells were properly chargeable as expenses in calculating whether the lease was producing in paying quantities.

Fourth, at trial, defendants' expense figures for the lease in question were arrived at by a proration of their total costs of operation for the entire Colony Field. Defendant conceded that it would not be "economical" to operate any of the leases, including the one in question, on an "individual basis." Defendants' logic is again flawed. The lease before us does not base termination upon whether the *Colony Field* can be produced in paying quantities. The lease provides for termination in the event oil and gas are not produced in paying quantities "from this land." "This land," in our view, is the land *covered by the lease.* Once again, the record supports the trial court's ultimate conclusion.

For all of the foregoing reasons, we conclude that the record contains ample substantial competent evidence to support the trial court's findings and conclusions and that, accordingly, defendants have failed to demonstrate error.

2. Defendants' final contention is that the result reached by the trial court is contrary to public policy prohibiting waste of natural resources. Determinations of policy always require a balancing of competing social interests. On the issue before us, the trial court reasoned as follows:

"I do not feel comfortable in passing from this question without making the following observations. I take judicial knowledge that increased production of oil is necessary to the future of this country. The Pilot Project now in operation on the Keown lease should be given encouragement and to this extent I wish the defendant success. My personal feeling is that I would like to give the defendant Colt an opportunity to prove the Polymer Injection Method before cancelling the lease. However, I cannot find it in the law that I have that right. To do so would require that I rewrite the lease entered into by the defendant in 1942. I further am aware that if each of the lessors choose to terminate the leases owned by Colt, we will not know whether the Polymer Injection Process will result in a successful form of tertiary recovery. To change the law, however, is an act required of the legislature, not of the courts, and if I were to insert my personal views I would be violating the amending process.

"Further, consideration must be given to the rights of the landowner. He should not be burdened with the existence of oil tanks, buried pipelines, unsightly slush pits, oil spills, casing pipes jutting from the ground, and other inconveniences

incidental to the operation of an oil and gas lease while receiving only meager royalties and with no assurance that such royalty will ever increase in amount. In its Suggested Findings of Fact defendant proposed an alternative judgment by which the Court would order plaintiff to accept what in effect is a minimum royalty until the success of the Pilot Project has been determined. This course of action was suggested by me to both counsel during the course of the trial as a possible means of settlement. The parties were unable to agree on such settlement. I do not believe I have the right, as I have previously stated, to rewrite the lease and provide for such minimum royalty."

We concur.

Plaintiffs' motion for costs and attorney fees is denied.

Affirmed.