No. 51,542

FRANK H. CLASSEN and HELEN CLASSEN, *Appellees,* v. THE FEDERAL
LAND BANK OF WICHITA, *Appellant.*

(617 P.2d 1255)

Opinion filed October 7, 1980.

*Richard Jones,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and *Ray Brummett* and *James M. Guy,* of The Federal Land Bank of Wichita, and *Evan J. Olson,* of Hershberger, Patterson, Jones & Roth, of Wichita, were with him on the brief for appellant.

*Eugene L. Smith,* of Smith, Greenleaf & Brooks, of Liberal, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: The Federal Land Bank of Wichita, Wichita, Kansas, (Land Bank) appeals from a judgment in favor of Frank H. and Helen Classen (the Classens) quieting their title to the oil, gas and other minerals under two quarter sections of land in Meade County.

The basic facts are not in dispute and were agreed to by stipulation of the parties. The stipulated facts pertinent to the issues in this appeal were:

"1. The Defendant, The Federal Land Bank of Wichita, was previously the owner of fee title to the surface and minerals in and under the following described real estate:

The Southwest Quarter (SW/4) of Section Five (5); the Northeast Quarter (NE/4) of Section Seven (7); and the Northwest Quarter (NW/4) of Section Eight (8); all in Township Thirty-three (33) South, Range Twenty-seven (27) West of the 6th P.M., Meade County, Kansas.

"2. On the 5th day of August, 1943, the Defendant conveyed the above described property to Frank H. Classen and Helen Classen, his wife, by warranty deed recorded in Book 40, Page 595.

"3. From said deed the Defendant excepted and reserved unto itself, its successors and assigns, an undivided one-fourth (¼) of all oil, gas and other minerals and mineral rights in, upon and under the above described real estate for a period of twenty (20) years from and after April 25, 1941,

'. . . and so long thereafter as oil, gas and/or other minerals or any of them are produced therefrom or the premises are being developed or operated . . .'

"4. On August 19, 1949, Frank H. Classen and Helen Classen, his wife, conveyed the Northeast Quarter (NE/4) of Section Seven (7), above described, to A. J. Enns, by warranty deed recorded in Book 44, Page 567.

"5. On November 28, 1950, Frank H. Classen and Helen Classen, his wife, executed and delivered to Columbian Fuel Corporation an oil and gas lease upon and covering the Northwest Quarter (NW/4) of Section Eight (8), and the Southwest Quarter (SW/4) of Section Five (5), above described. The said oil and gas lease was recorded in Book 7, Page 521 and was subsequently assigned to Diamond Shamrock Corporation.

"6. On November 28, 1950, the Defendant, The Federal Land Bank of Wichita, Wichita, Kansas, made, executed and delivered to Columbian Fuel Corporation an oil and gas lease, covering the Southwest Quarter (SW/4) of Section Five (5) and the Northwest Quarter (NW/4) of Section Eight (8), above described. Said lease was recorded in Book 8, Page 284 and was subsequently assigned to Diamond Shamrock Corporation.

"7. On May 5, 1958, A. J. Enns and Susie Enns, his wife, conveyed the Northeast Quarter (NE/4) of Section Seven (7) to Menno A. Friesen and Hilda L. Friesen, his wife, as joint tenants, by deed recorded in Book 49, Page 128.

"8. By Declaration of Consolidation of Gas Leasehold Estate, dated October 20, 1958, the hereinabove described oil and gas leases, as amended, were pooled and unitized by the then record owners with other leases on other lands, to form a consolidated gas leasehold estate upon and covering all of Section Eight (8), Township Thirty-three (33) South, Range Twenty-seven (27) West, Meade County, Kansas.

"9. Thereafter, on or about March 30, 1959, and within the primary term of the Defendant's one-quarter (¼) mineral interest reservation, a well productive of gas in paying quantities was drilled upon said pooled and unitized gas leaseholds estates—the said well being located on the Southeast Quarter (SE/4) of said Section Eight (8).

"10. Said well has continuously produced gas in paying quantities since March 30, 1959, and continues to produce gas in paying quantities at this time. Since commencement of production, royalties on such production attributable to the Northwest Quarter (NW/4) of Section Eight (8) have been paid, and continue to be paid, three-fourths (¾) to Plaintiffs, and one-fourth (¼) to Defendant. Such division and payment of royalty has been made at all times with the full knowledge of Plaintiffs.

"11. On November 30, 1960, the then record owners of the oil and gas leases described in paragraphs numbered 5 and 6 above released the leases, only insofar as they covered the Southwest Quarter (SW/4) of Section Five (5) hereinbefore described. The release is recorded in Book G, Page 239.

"12. On April 25, 1961, there was no producing oil or gas well drilled, or in the process of being drilled, which was physically located on any of the three quarter sections originally conveyed by the Defendant to the Plaintiffs by deed recorded in Book 40, Page 595.

.  .  .  .

"19. To date, no producing oil or gas well has ever been physically located and drilled upon the Southwest Quarter (SW/4) of Section Five (5) or on the Northwest Quarter (NW/4) of Section Eight (8), above described."

Hereafter the Northwest Quarter of Section Eight will be referred to as Tract 1; the Northeast Quarter of Section Seven as Tract 2; and the Southwest Quarter of Section Five as Tract 3.

At the outset we deem it appropriate to comment that although, strictly speaking, "pooling" refers to the consolidation of multiple tracts for purposes of forming a drilling or spacing unit, and "unitization" refers to a consolidation of tracts for joint operation of all or part of a reservoir, the terms are often used interchangeably. 5 Summers, Oil and Gas § 951. In the context of their use in this opinion, we will be referring to a gas spacing or drilling unit. Likewise, a term mineral interest may be created by either grant or reservation, resulting in two types of future interests. Many

courts and authorities describe the potential interest to be obtained by the fee owner upon termination of the term mineral interest as a "reversion," regardless of the method of creation, and the owner thereof as the "reversioner." As rules of law considered herein apply equally to either method of creation, we will not attempt to differentiate between the two types of interests and will use the more commonly understood terms relating to reversionary interests.

Tract 2, owned by Menno and Hilda L. Friesen, was the subject of a separate quiet title action in the Meade County District Court against the Land Bank wherein the Friesens' title was quieted against the one-fourth mineral interest claimed by the Land Bank and therefore Tract 2 is not directly involved in this appeal. That decision was recently affirmed by this court in *Friesen v. Federal Land Bank of Wichita,* 227 Kan. 522, 608 P.2d 915 (1980), and we will not repeat here additional facts set forth therein.

In the fall of 1958, the Land Bank and the Classens executed separate documents to Shamrock Oil and Gas Corporation, evidently an assignee of the leases to Diamond Shamrock Corporation, amending the oil and gas leases described in stipulations 5 and 6 above. The purpose of the amendments was to allow the consolidation of the gas leasehold estates on Tract 1 with the rest of Section 8 to form one 640 acre unit for the production of gas. The properties involved are located in what is known as the McKinney Gas Field. The Kansas Corporation Commission has assumed jurisdiction of the field and on July 9, 1958, issued a basic proration order which includes the following findings:

"3. COMMON SOURCE OF SUPPLY. The McKinney Gas Field is a common source of supply of natural gas within the purview of and as contemplated by G.S. 1949, Chapter 55, Article 7; that said common source of supply exists from the top of the Morrowan Sandstones of the Pennsylvanian System to the base of the Chester Formation of the Mississippian System. In the interest of the conservation of natural gas and prevention of waste thereof, the public interest requires that the Commission take jurisdiction of said field and adopt and promulgate appropriate rules and regulations relating to the production, sale and conservation of natural gas from the said field.

"4. JURISDICTION REQUIRED. In order to prevent disproportionate production from the wells and leases in said field which might impair the correlative rights of the owners of developed leases and in order to comply with the existing statutes to provide for orderly development in well spacing, it is necessary for the Commission to take jurisdiction and to prescribe regulations for the production of gas from presently completed wells and others that may be hereafter completed in said field, to the end that each person, firm, or corporation having the right to drill

into and produce natural gas from said field may take therefrom only such proportion of the amount that may be produced therefrom without waste and as will permit each developed lease to produce ultimately at least approximately the amount of gas underlying the lease on which such well is located and currently produce proportionately with the other leases in said field.

"5. ACREAGE AND WELL SPACING. One well completed in said formation can adequately and sufficiently drain 640 acres without causing waste and, considering the cost of drilling, equipping and operating one well in comparison with the estimated recovery per acre and the rate at which the production for said field can be ratably and nonwastefully marketed, the Commission finds that the basic acreage unit to be used in the proration formula hereinafter prescribed should be 640 acres and that in no instance shall more than 640 acres be attributable to a well for the purpose of calculating the acreage factor except by specific order of the Commission."

In the trial court the Hon. Robert M. Baker originally ruled that the Classens' title to Tract 3 should be quieted against the Land Bank, as there had been no production from that tract and it was not included within a producing unit. The court denied the Classens' claim as to Tract 1 and held the mineral interest of the Land Bank was perpetuated by production from the gas unit comprising Section 8 which did include Tract 1. Shortly thereafter Judge Baker resigned to return to private law practice and the Hon. Don C. Smith was appointed to succeed him. Following Judge Smith's appointment, the Classens filed a motion seeking an amendment of Judge Baker's findings of fact and conclusions of law. This motion was sustained and thereupon Judge Smith entered judgment for the Classens quieting their title against the Land Bank to Tract 1 as well as Tract 3. This appeal followed.

The primary term of the mineral reservation in the original deed to the Classens was until April 25, 1961, and it is agreed that as of that date no wells had ever been drilled on Tracts 1, 2 or 3, and the properties were not being developed or operated by any actual physical activity upon the surface of any of the tracts. It is the contention of the Land Bank that the production from and the development and operation of the well on the Southeast Quarter of Section 8 constitutes actual production from and operation or development of Tract 1. The Land Bank argues that due to drainage of gas from under Tract 1 and its inclusion in the consolidated gas unit covering all of Section 8, its one-fourth mineral interest as to both Tracts 1 and 3 has been extended past the primary term. The Classens contend that to extend the primary term by production, operation or development, the produc-

tion must actually come from a well mouth located on one of the three tracts or that any operation or development must be physically carried out upon one of the tracts.

The only evidence introduced at the trial in addition to the stipulations and documents supporting those stipulations was the testimony of John R. Van Slyke on behalf of the Land Bank. Mr. Van Slyke, a consulting petroleum engineer, qualified as an expert and testified in the Friesen trial that the well located in the Southeast Quarter of Section 8 was actually producing gas from under Tract 1 through the well mouth located on the Southeast Quarter. A transcript of Mr. Van Slyke's testimony from the trial in the Friesen case was introduced by agreement and stipulation in the trial of the present action. Therefore, the trial court did have before it the opinion of an expert that gas from Tract 1 was being produced through the well on other property in Section 8 which comprised the producing gas unit agreed to by all owners of mineral interests in the section and which was approved and authorized by the Kansas Corporation Commission. The Classens contend that all such testimony is immaterial and that absent production from a well mouth upon Tract 1, 2 or 3, and absent any physical development or operation on one of such tracts on April 25, 1961, the mineral interest of the Land Bank expired by its own terms as contained in the original deed reserving the mineral interest. The Classens rely upon our prior decisions in *Dewell v. Federal Land Bank,* 191 Kan. 258, 380 P.2d 379 (1963); *Stratmann v. Stratmann,* 204 Kan. 658, 465 P.2d 938 (1970); and *Smith v. Home Royalty Association, Inc.,* 209 Kan. 609, 498 P.2d 98 (1972). These cases were recently considered by this court in *Friesen v. Federal Land Bank of Wichita,* 227 Kan. 522. We need not repeat all that was said in *Friesen,* and suffice it to say we are of the opinion that *Smith v. Home Royalty Association, Inc.* and *Friesen* are controlling in this case insofar as Tract 3 is concerned and we affirm the trial court's decision as to Tract 3. However, we deem it advisable to reconsider our prior holdings as they may affect Tract 1.

Defendant contends that the district court made a finding of fact that gas was actually being produced from under Tract 1 through the well on the Southeast quarter of the unit. The Land Bank bases its contention upon a statement in the trial court's memorandum decision which reads:

"There is uncontradicted evidence from Defendants' expert, Mr. Van Slyke to the effect that gas lying under tract 1 contributes to the whole production as it comes from the well mouth in the Southeast quarter of 8."

As indicated above, the testimony of Mr. Van Slyke consisted of a transcript of his testimony in the Friesen trial. At the hearing on a motion for amendment of findings of fact and conclusions of law in the Friesen case, the court in commenting upon the Van Slyke testimony stated:

"I heard it all and I considered it all. And with all due respect to Mr. Van Slyke when I heard the testimony, I didn't think it amounted to anything. But I didn't ignore it."

The expert testimony of Mr. Van Slyke was properly admitted but the weight to be given to it was to be determined by the trier of the facts. Considering the statements of the trial judge who heard the testimony and observed the witness, we do not believe that the statement in the memorandum decision rises to the level of a finding of fact which required the trial court or requires this court to find as a matter of law that production was being obtained from Tract 1 within the terms of the habendum clause of the original deed from the Land Bank to the Classens. Neither does it require a finding that Tract 1 was being operated or developed on April 25, 1961.

However, we do not consider that this disposes of this appeal. As previously indicated plaintiffs rely upon three cases from this court plus, presumably, our decision in *Friesen.*

The first of the cases which led to the rule of law which plaintiffs rely upon was *Dewell v. Federal Land Bank,* 191 Kan. 258. In *Dewell* the sole question before the court was whether a shut-in gas well, together with payment of shut-in royalty, would extend a term mineral interest beyond the primary term under a mineral reservation identical to the one in the instant case. We held:

"The payment of shut-in royalty is not the equivalent of 'production' or 'being developed or operated.' As the land was not being produced, developed or operated, the mineral interest was not perpetuated or extended beyond the primary term." p. 263.

The next in the trilogy of cases was *Stratmann v. Stratmann,* 204 Kan. 658. In *Stratmann* 240 acres of land had been partitioned into three eighty-acre tracts; however, the minerals under all three tracts were not partitioned but were retained propor-

tionately by all the previous surface owners "for such a period of time as oil and/or gas or either of them is being produced in paying quantities from said real estate [the entire 240 acres]." p. 659. At the time of partition each of the three eighty-acre tracts was subject to a separate oil and gas lease. Production ceased upon the eighty acres in question but continued on the other property. Plaintiffs sought to quiet title to their eighty acres and terminate the defendant's mineral interest therein. This court stated:

"It is generally held that where land held in common is divided by a decree in partition in which it is provided the mineral rights in the whole of the land shall remain undivided, the reservation reserves to the common owners the minerals in place under the land divided. (68 C.J.S., Partition § 120(b), p. 181.)" p. 665.

The court went on to hold that production from any portion of the original 240 acres perpetuated the term mineral interests under all the property.

In the course of the opinion in *Stratmann* the court made the following statement about *Dewell:*

"In *Dewell* a term mineral interest under a half section of land was reserved in a deed. The reservation ran for a primary term of twenty years and as long thereafter as oil was produced from the premises. The interest was leased and the lease on this half section was unitized with leases on other land. Production was obtained on the other land. There were no producing wells drilled on the half section of land. The court held that production on the other land did not perpetuate the mineral interest on the half section beyond the primary term. To perpetuate the interest production had to come from the half section." p. 663.

This statement expanded the decision in *Dewell* wherein the court merely held a shut-in gas well and payment of shut-in royalty did not constitute production, development or operation.

Next came *Smith v. Home Royalty Association, Inc.,* 209 Kan. 609. Plaintiff Smith filed an action to quiet title to a quarter section of land in Stanton County against the defendant's term mineral interest therein. The dispute was whether the term mineral interest created December 10, 1928, had been extended beyond its primary term which ended December 10, 1949, by production commenced within the primary term on an adjacent quarter, both quarters being within a unitized leasehold. The court stated the question as:

"A conveys to B the oil, gas and other minerals under tract one for a term of twenty-one years and as long thereafter as oil, gas, or other minerals are produced from said land. During the definite term tract one is unitized with tract two for the

production of oil and gas. Production is obtained from tract two within the definite term and production continued thereafter. In this factual situation, does production from tract two fulfill the production requirements in the original conveyance from A to B?" p. 611.

This court held that it did not, based upon the holding in *Dewell* as expanded by the statements in *Stratmann*. It is the generally accepted rule that, absent agreement to the contrary, a term mineral interest cannot be changed or altered by the terms of an oil and gas lease or a unitization agreement entered into between the term mineral owner and a third party lessee or by the holder of the reversionary interest and a third party lessee. The court quoted the following language from *Dewell*:

"The owner of a defeasance mineral interest cannot change the conditions by which the interest is to continue beyond the primary term, by any provision in an oil and gas lease to which the landowner is not a party." p. 612.

We further stated:

"[T]he holdings in *Dewell* and *Stratmann* have become a rule of property in this state. The rule should not be changed in the absence of other controlling circumstances, even though logic might be effectively presented for a different holding." p. 614.

In this day and age are there "other controlling circumstances" which dictate a departure from the rule of *Smith?* We think so. At the outset we wish to reaffirm certain basic principles which are not affected by our holding herein except as specifically hereinafter set forth.

1.) When a deed, or other instrument, creates a defeasible term mineral interest in two or more tracts of land production, development or operation (depending upon the particular wording of the habendum clause creating the term interest) on any one tract will extend the primary term as to all other tracts. *Baker v. Hugoton Production Co.,* 182 Kan. 210, 320 P.2d 772 (1958).

2.) A deed or other instrument conveying oil and gas in place for a fixed term of years and so long thereafter as oil and/or gas is being produced from the property or the property is being developed or operated creates a base or determinable fee. *Wilson v. Holm,* 164 Kan. 229, 188 P.2d 899 (1948).

3.) The event which perpetuates the term of the mineral interest must be found in the instrument creating it. *Stratmann v. Stratmann,* 204 Kan. 658, 465 P.2d 938 (1970).

Let us now turn to the question of whether our prior decisions in this area should be modified to the extent that when all or part of a term mineral interest is unitized for the production of gas (or oil in a proper case) with other land and production is obtained from a well or wells located on such other land, such production extends the term mineral interest in that portion of the land contained within the producing unit. We think they should.

It is now common knowledge that this tired old world of ours, and our country in particular, is faced with a frightening and progressive energy crisis due principally to a shortage of petroleum reserves. This country cannot now, and will not in the foreseeable future be able to, produce even the minimum requirements of oil and gas needed to preserve our existence. With every increase in production we suffer a corresponding decrease in our petroleum energy reserves. Under these severe conditions we feel that it is incumbent on all persons, including this court, to assist in the preservation and conservation of our natural petroleum resources including production methods which will minimize waste.

Pooling and unitization are basically conservation measures adopted either by forced regulation in some states or by voluntary agreement. Our Kansas Corporation Commission has the duty and authority to promote the conservation of our petroleum resources through the assignment of allowables based upon drilling and spacing units. The primary purpose of unitized operations is to permit proper and maximum development of the unit lands without reference to ownership boundaries and with a minimum of waste. These objectives may better be realized by the adoption of the rule that whenever a term mineral interest is voluntarily placed in a unit for the production of gas or oil and production is obtained on other land within the unit during the primary term, such production will extend the term mineral interest to the extent of the land and mineral interests included within the producing unit.

The adoption of such a position is not only economically sound but morally correct in that all parties are treated fairly and equitably which will, in most cases, be advantageous to all mineral owners (term or fee) within the unit. For example, in the instant case if either the Land Bank or the Classens had refused to enter into unitization of Section 8, it might very well be that no

well would have been drilled, to the disadvantage of all owners within the section. In addition, it would result in the even greater disadvantage to the general public from a failure to properly develop and produce the potential available. Our holding herein will tend to avoid the situation where the reversioner holds out on his agreement to unitize unless the lessee will agree to drill the well on other property in the unit in an attempt to assure the termination of the term mineral interest at the expiration of the primary term. Likewise, the holder of the term interest will not be placed in a position of insisting that the well be placed upon the property in which he holds the term interest. Either alternative might not be in the best interests of appropriate conservation and production of our resources. It appears to us that an individual mineral owner who enters into a unitization agreement with the hopes of sharing in the advantages must also bear the disadvantages inherent in such development.

The correctness of such a determination appears to have been recognized by the parties to this action. It has been stipulated that although the primary term of the mineral reservation of the Land Bank expired April 25, 1961, the Land Bank has continued to receive its proportionate share of the proceeds from the gas produced from the unit. These payments were made with the full knowledge, and presumably consent, of the plaintiffs until the filing of this action in March, 1978. It would appear that the parties themselves have long recognized the rule which we adopt today.

As pointed out in *Smith* the rule in Oklahoma (*Panhandle Eastern Pipe Line Company v. Isaacson,* 255 F.2d 669 [10th Cir. 1958]), and Texas (*South. Royalty Co. v. Humble Oil & Ref. Co.,* 151 Tex. 324, 249 S.W.2d 914 [1952]), is that production anywhere on the unit extends term mineral interests when any part of such term mineral interest lies within and is subject to the unitized operations. Considering our holding in this case, we see nothing to be gained by reviewing and comparing the various rationales of other states in arriving at their particular decisions. For those interested, we recommend 6 Williams and Meyers, Oil and Gas Law, § 960 *et seq.* (1977); 1 Myers, The Law of Pooling and Unitization, ch. 14 (2d ed. 1967); 5 Summers, Oil and Gas, ch. 29 (1966); Brock, The Effect of Unitization on Defeasible Term Interests, 26th Annual Institute on Oil and Gas Law and Taxation, p. 267 (1975).

To specifically illustrate the rule hereby adopted, we turn to the facts of the case at bar. Tracts 1 and 3, owned by the Classens, were both subject to a defeasible term one-fourth mineral interest of the Land Bank created in a single instrument for a primary term of twenty years from April 25, 1941, and so long thereafter, etc. Tract 1 was voluntarily placed in a 640 acre gas unit by the Land Bank and the Classens and gas production was obtained from other property within the unit during the primary term of the mineral reservation. We hold that such production extends the primary term of the mineral interest held by the Land Bank as to Tract 1 but not as to Tract 3, which was not included in the unit.

To the extent that the foregoing conflicts with *Smith v. Home Royalty Association, Inc.,* and other prior decisions of this court, those decisions are disapproved.

Other points raised by the Land Bank were also raised and considered in *Friesen* and found to be without merit.

The judgment of the district court as to the Southwest Quarter of Section Five is affirmed and the judgment as to the Northwest Quarter of Section Eight is reversed.

SCHROEDER, C.J., concurring: I would adhere strictly to the decision in *Smith v. Home Royalty Association, Inc.,* 209 Kan. 609, 498 P.2d 98 (1972), which was recently affirmed in *Friesen v. Federal Land Bank of Wichita,* 227 Kan. 522, 608 P.2d 915 (1980).

Under the law in these decisions the expert testimony of Mr. Van Slyke is irrelevant.

However, on the facts in this case, the Classens leased Tract I (the quarter section which they owned), and later joined Tract I in a unitization agreement with other land. When a well productive of gas in paying quantities was drilled on the other land within the unitized gas leasehold estates, in accordance with stipulated facts 9 and 10, the Classens voluntarily acknowledged the *de facto* existence of a ¼ royalty interest in the Federal Land Bank from March 30, 1959, until suit to quiet title was filed in March 1978.

Under these circumstances the Classens should be *estopped* to deny the interest of the Federal Land Bank in the production of gas from the unitized gas leasehold estates, which included Tract I owned by the Classens.

In my opinion, it is improper to modify established law when hard facts are encountered. Compromising and labeling this case as "doing equity" makes bad law. Henceforth, attorneys will attempt to apply and expand the doctrine to show drainage from a tract of land covered by a term mineral reservation (described in Syllabus ¶ 2) where the production of oil or gas is found beyond the confines of the land covered by the mineral reservation during the primary term of the reservation. The stability of our established body of oil and gas law is shaken by the opinion and the comments of the court in this case.

HERD, J., concurring and dissenting: I concur in the result reached by the majority pertaining to Tract 1 but disagree with the rationale. I dissent from the majority opinion as to Tract 3.

The majority opinion requires that gas production come from a well physically drilled on the reserved acreage to perpetuate a mineral reservation. This holding denies the use of scientific methods of recovery of gas, breaches all rules of good conservation practice and defies Kansas Corporation Commission rules and regulations. I would hold the gas production from Section Eight (8), one-fourth of which is attributable to Tract 1 (Northwest Quarter of Section 8), is "production" as contemplated in the mineral reservation in the Classen deed and perpetuates the reservation under the habendum clause as to Tract 1. Production attributable to Tract 1 in this manner would perpetuate the reservation on the remaining acreage described in the deed, in this case Tract 3, pursuant to *Baker v. Hugoton Production Co.,* 182 Kan. 210, 320 P.2d 772 (1958). This holding would be consistent with my dissent in *Friesen v. Federal Land Bank of Wichita,* 227 Kan. 522, 608 P.2d 915 (1980), which attempts to clarify the inconsistencies in *Dewell v. Federal Land Bank,* 191 Kan. 258, 380 P.2d 379 (1963); *Stratmann v. Stratmann,* 204 Kan. 658, 465 P.2d 938 (1970); and *Smith v. Home Royalty Association,* 209 Kan. 609, 498 P.2d 98 (1972), and which recommended we adopt the rule in *Panhandle Eastern Pipe Line Company v. Issacson,* 255 F.2d 669 (10th Cir. 1958).