No. 111,973

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

OXY USA, INC.,
*Appellee*,

v.

RED WING OIL, LLC, *et al.*,
*Appellees*,

(ALICE LAVELLE KING),
*Appellant*.

SYLLABUS BY THE COURT

1.

A deed conveying an interest in subsurface minerals for a fixed term of years and so long thereafter as minerals are produced creates and immediately vests a defeasible property interest.

2.

The grantor of such a defeasible property interest retains a reversionary interest in the mineral rights that reverts to the grantor upon a cessation of production.

3.

Based upon the rule stated in *Smith v. Home Royalty Association, Inc.*, 209 Kan. 609, 498 P.2d 98 (1972), which is applicable to this case, production on property included in a unitized or consolidated lease is not production within the meaning of the property deed containing the reservation of a half-interest in the mineral rights.

4.

K.S.A. 60-507 is construed and applied.

5.

The right of reversion or the possibility of reverter is a vested future interest known as a fee simple determinable. A fee simple determinable is legally distinguishable from a fee simple subject to a condition subsequent. The former creates a reversionary interest that reverts the property back to the grantor upon the condition set for reversion. The latter creates a right of reentry that requires the interest holder to act upon the condition.

6.

K.S.A. 60-503 is construed and applied.

7.

A cotenant may not obtain ownership of another cotenant's property by adverse possession.

8.

Acquiescence, as used in this case, is a form of estoppel precluding a party from taking a legal position inconsistent with past actions.

9.

The reservation of mineral rights in a deed is not read in pari materia with the terms of an oil and gas lease extant at the time the deed is created.

Appeal from Haskell District Court; BRADLEY E. AMBROSIER, judge. Opinion filed October 16, 2015. Reversed and remanded with instructions.

*Jacob M. Cunningham*, of Doering & Grisell, P.A., of Garden City, for appellant.

*Willard B. Thompson*, *David G. Seely*, and *Dan E. Lawrence*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, and *Erick E. Nordling*, of Kramer, Nordling & Nordling, LLC, of Hugoton, for appellees Red Wing Oil, LLC, *et al*.

Before MCANANY, P.J., GARDNER, J., and WALKER, S.J.

WALKER, J.:  In this appeal, we consider whether the district court properly terminated the reversionary rights of a landowner to one-half of the minerals under her land. Because we find the court did not correctly apply the law, we reverse and remand with instructions to restore the mineral rights to the landowner.

FACTS

In January 1945, Frank Luther obtained the northeast quarter of a section of land in Haskell County (the northeast quarter), which was subject to an existing lease for the production of oil and gas. Shortly thereafter, in April 1945, Luther sold the 160-acre tract to E.W. Rahenkamp. In his deed to Rahenkamp, Luther reserved a one-half interest in the mineral rights for a period of 20 years "or as long thereafter as oil, gas or other minerals is produced therefrom."

After a few other subsequent conveyances, in 1955 the northeast quarter was deeded to Floyd W. Leonard, subject to the Luther half-interest and the oil and gas lease. In the intervening years after Luther's ownership of the land, the company holding the lease interest in the exploration and production of minerals in the northeast quarter unitized and consolidated the lease on the northeast quarter with leases on neighboring

3

property. These other properties produced oil and/or gas under the unitized and consolidated lease, but no minerals were produced on the northeast quarter from March 27, 1945, until 2009, when Oxy USA, Inc. began producing oil and/or gas from the Tice Cattle #3 well on the northeast quarter.

In 1992, Floyd W. Leonard quit-claimed half of his interest in the northeast quarter to his wife, M. Berenece Leonard. Both Floyd and Berenece drafted mirror-image wills that left their property in trust for the benefit of the surviving spouse and then their children. Berenece died on December 22, 1999; Lloyd died on March 24, 2005. In March 2008, Floyd Junior Leonard, as trustee, conveyed the northeast quarter to Alice LaVelle King, a daughter of Floyd and Berenece. King is the current owner of the northeast quarter, including the one-half mineral interest which was not reserved by Luther, and she is the appellant in this action.

Luther's one-half interest in mineral rights on the northeast quarter was divided and passed to multiple parties. The bulk of the named defendants in this litigation are holders of some fraction of Luther's one-half interest and include at least 41 separate persons or entities. Because all of the defendants except King and the M. Berenece Testamentary Trust appear united in interest in this litigation and in order to reduce confusion, all of the defendants holding some fractional mineral interest will be collectively referred to as "the Luther mineral interest holders."

Though the record is unclear as to details, Oxy USA, Inc. became the successor-in-interest to the unitized and consolidated oil and gas lease encompassing the northeast quarter. In 2009, Oxy USA, Inc. began to produce oil and/or gas on the Tice Cattle #3 well located on the northeast quarter. Unable to discern the rightful recipient of royalty payments, Oxy USA, Inc. filed this interpleader and quiet title action to determine who currently holds the mineral rights to the property.

4

After the parties responded to the petition and the district court established the pertinent issues in the case through a pretrial conference, the Luther mineral interest holders and King filed competing motions for summary judgment. On March 17, 2014, the district court rendered a decision, construing the applicable caselaw to conclude that King's reversionary interest was triggered in 1972 but holding that her claim was untimely and that she acquiesced in the continuation of the Luther mineral interest. The court granted summary judgment in favor of the Luther mineral interest holders. Though the district court judge did not specifically rule on King's competing motion for summary judgment, his granting of summary judgment to the Luther mineral interest holders had the practical effect of denying King's motion to terminate their interests and order the Luther one-half interest returned to her.

King filed a timely notice of appeal from the district court's judgment, and the Luther mineral interest holders filed a timely notice of cross-appeal.

ANALYSIS

Before turning to the specific issues in this case, we must consider the legal nature of the parties' interests.

A deed conveying an interest in subsurface minerals for a fixed term of years and so long thereafter as minerals are produced creates and immediately vests a defeasible property interest. *Wilson v. Holm*, 164 Kan. 229, 234-35, 188 P.2d 899 (1948) ("[I]n this state a deed, conveying oil and gas in place for a fixed term of years and so long thereafter as either or both are produced in paying quantities, creates a base or determinable fee and that title to the estate so created vests immediately upon the execution and delivery of such an instrument but remains defeasible in the event of cessation of production.").

The conveyance of mineral rights severs the property interest in the surface rights from the property interest in the subsurface minerals. *Mining Co. v. Atkinson*, 85 Kan. 357, 360, 116 P. 499 (1911) ("'After the mineral is conveyed apart from the land, or *vice versa*, two separate estates exist, each of which is distinct; the surface and the mineral right are then held by separate and distinct titles in severalty, and each is a freehold estate of inheritance separate from and independent of the other.'" [quoting 27 Cyc. 687]). The grantor of this defeasible property interest retains a reversionary interest in the mineral rights because the interest will revert to the grantor upon a cessation of production. See *Wilson*, 164 Kan. at 236-37.

In this case, when Frank Luther conveyed the northeast quarter to E.W. Rahenkamp, which subsequently descended to Alice LaVelle King, he actually created a defeasible estate by reservation rather than affirmative grant. But the law makes no distinction between how these interests are treated. *Classen v. Federal Land Bank of Wichita*, 228 Kan. 426, 428-29, 617 P.2d 1255 (1980) ("[A] term mineral interest may be created by either grant or reservation, resulting in two types of future interests. Many courts and authorities describe the potential interest to be obtained by the fee owner upon termination of the term mineral interest as a 'reversion,' regardless of the method of creation, and the owner thereof as the 'reversioner.' As rules of law considered herein apply equally to either method of creation, we will not attempt to differentiate between the two types of interests and will use the more commonly understood terms relating to reversionary interests.").

Therefore, for purposes of this case, Luther retained for himself and his heirs a term mineral interest in an undivided half of the mineral rights of the northeast quarter, while granting to Rahenkamp and his assigns a reversionary interest in those mineral rights. There is no dispute in this case that King now holds that reversionary interest. She also holds all of the surface property rights and an undivided one-half interest in the mineral rights of the northeast quarter originally conveyed to Rahenkamp in 1945. The

6

dispute in this case revolves around King's reversionary interest. More specifically, the issue in this case concerns whether the Luther mineral one-half interest has reverted to King due to nonproduction of minerals.

The material facts are undisputed. No production of minerals has occurred on the northeast quarter since the defeasible interest was created in 1945 until Oxy USA, Inc. began producing oil and/or gas from the Tice Cattle #3 well in 2009. Although the record is unclear, oil and/or gas has apparently been continuously produced from wells within the same unitized lease. A determination of whether the defeasible interest of the Luther mineral interest holders terminated rests on whether production under a unitized lease qualifies for production under the defeasible deed reservation. Three Kansas Supreme Court cases are important to the resolution of this question.

In *Smith v. Home Royalty Association, Inc.*, 209 Kan. 609, 613-14, 498 P.2d 98 (1972), the Kansas Supreme Court first considered the question. After reviewing pertinent precedent, the court reasoned that the terms of a lease had no bearing upon the terms of a defeasible property interest created by deed. The terms of one could not control the interpretation given the other. Since production was not defined in the deed to include production under a unitized or consolidated lease agreement, "production" within the meaning of the deed must refer to production occurring on the subject property.

Eight years later, the Kansas Supreme Court revisited its ruling and overturned *Smith*. The *Classen* court ruled that production within the meaning of a defeasible term mineral interest included production occurring on unitized or consolidated lease property. 228 Kan. at 435-37. Ten years after *Classen* was decided, the court revisited the issue again to determine whether a defeasible mineral interest, the term of which had expired before *Classen* was decided, would be retroactively governed by the rule stated in *Classen*. Because it was impossible to determine what had happened to the myriad of interests that might have expired or how many innocent purchasers for value had changed

7

position because of *Smith*, the Supreme Court determined that *Classen* could not be given retroactive effect. *Kneller v. Federal Land Bank of Wichita*, 247 Kan. 399, 404, 799 P.2d 485 (1990).

After reviewing these cases, the district court in the present case reasoned that the construction of the Luther mineral interest should be governed by *Smith*. Accordingly, since no production had occurred on the northeast quarter during the 20-year term provided by the deed reservation, King's reversionary interest was triggered. But, since the court believed King or her predecessors should have been aware of their reversionary rights as of *Smith* in 1972, the court held that the 15-year statute of limitations under K.S.A. 60-507 barred enforcement of that reversionary interest.

Additionally, the court implied that King should be estopped from claiming her reversionary interest by acquiescing to the Luther mineral interest holders' continued possession of a portion of her property. In effect, the court held that King had waived her right to complain about the rights of the Luther mineral interest holders by failing to take legal action to seek their cancellation. The district court cited no legal authority for this last holding.

On appeal, King claims that the district court erred in holding that her reversionary claim was barred by the statute of limitations and/or acquiescence. The Luther mineral interest holders counter that the district court's application of procedural bars to King's claim was proper but that the district court's decision may be alternately affirmed by correctly construing the extent of the holding in *Smith*. Each of these arguments will be considered in turn.

The legislative enactment containing the statute of limitations for actions affecting real property is K.S.A. 60-507, which provides:

"No action shall be maintained for the *recovery* of real property or for the *determination of any adverse claim or interest therein*, not provided for in this article, after fifteen (15) years from the time the cause of action accrued." (Emphasis added.)

A statute of limitations is a procedural bar to the right to pursue a remedy for an accrued cause of action after a period of time. See *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, 668, 831 P.2d 958 (1992). The district court read K.S.A. 60-507 to require King to assert her claim to the Luther mineral interest 15 years after her right to reversion was established when *Smith* was decided. We disagree with this interpretation.

The right of reversion or the possibility of reverter is a vested future interest known as a fee simple determinable. This right is distinguishable from the right of entry when a grantor creates a fee simple subject to condition subsequent. Practically speaking, the difference between the right of reversion (or possibility of reverter) and the right of entry by condition subsequent is that reverter occurs automatically upon the condition set for reversion, and the right of entry upon a condition subsequent requires action by the grantor when the condition is satisfied. See *State v. Goldberg*, 437 Md. 191, 223, 85 A.3d 231 (2014) (citing 1 Simes and Smith, The Law of Future Interests § 92 [Borron 3d ed. 2002]); *Ditmore v. Michalik*, 244 Mich. App. 569, 580, 625 N.W.2d 462 (2001); 1 Kuntz, Oil and Gas § 15.8, p. 459 (1987) ("When there has been neither a discovery nor production within the fixed or primary term of the interest granted, the interest will terminate automatically upon expiration of the fixed term, and if the grantee remains in possession and subsequently produces, he [or she] will be treated as a tenant at will.").

Though Kansas cases use "reverter" and "right of entry" interchangeably, see *Miller v. Stoppel*, 172 Kan. 391, 397, 241 P.2d 488 (1952), there is clear indication in Kansas caselaw indicating that a defeasible mineral interest conditioned on mineral production creates a reversionary interest in the property owner and that the terminable mineral interest terminates immediately upon cessation of production. See *Wilson*, 164

9

Kan. at 240 ("In the event of their failure to do so, it is our view production as contemplated by the parties is to be regarded as having ceased, their conveyance terminates and any estate theretofor held by them under and by virtue of its terms reverts to the grantors.").

If reversion occurs automatically upon the cessation of production, as many authorities suggest, see generally 1 Kuntz, Oil and Gas § 15.8, p. 459 (1987), King was not required to reenter the property or to bring a lawsuit to protect her interests in the property. Once production actually ceased, the term mineral interest reverted automatically to King. This is consistent with the Kansas Supreme Court's ruling that a mineral interest holder bears the burden of proving that reversion has not occurred by establishing that the cessation in production was merely temporary.

"Obviously, since production under a lease depends in the first instance upon action or inaction on the part of the lessee and since the ultimate test as to whether an estate created by a deed has terminated depends entirely upon its own provisions, it must follow that the parties to a mineral deed, providing the estate conveyed to the grantees shall continue so long as oil is produced in paying quantities, do not contemplate that failure of a lessee to produce oil in paying quantities works a defeasance *ipso facto*. To hold otherwise would mean that failure of the lessee to so produce because of neglect, poor judgment, fraud, connivance with the owners of other mineral interests, voluntary abandonment of the lease, or any unjustifiable reason over which the grantees had no control, would have that result. That, however, does not mean that owners of mineral interests can sit idly by and do nothing when the lessee ceases to operate or production stops for any other reason. Neither does it mean, as appellants contend, that any cessation which is resumed at some future date cannot be deemed permanent but must be construed as temporary for the construction would result in a nullification of the defeasance clause itself. We believe proper construction of such an instrument requires the conclusion that if for any reason there is a cessation of production of oil in paying quantities on the land covered by its terms the owners of the minerals in place are required to move promptly and by their efforts actually establish that such cessation, regardless of its cause, is temporary, not permanent. In the event of their failure to do so, it is our view production

10

as contemplated by the parties is to be regarded as having ceased, their conveyance terminates and any estate theretofor held by them under and by virtue of its terms reverts to the grantors." *Wilson*, 164 Kan. at 239-40.

A contrary ruling would essentially divest King of her reversionary interest 15 years after production ceased, akin to obtaining the property interest through adverse possession. The district court concluded that nonproduction of the mineral interests on the property should have triggered reversion but, as King did not bring an action to enforce her rights, the statute of limitations barred her claim of reversion in the quiet title action. This ruling has the practical effect of divesting King of her reversionary interest in the property.

Under the district court's reasoning, the Luther mineral interest holders have perpetuated their right to the mineral interests of the northeast quarter indefinitely through wrongfully retained possession of their interest for more than 15 years. As King notes, this result is tantamount to permitting the Luther mineral interest holders to take an interest in property by adverse possession. See K.S.A. 60-503 ("No action shall be maintained against any person for the recovery of real property who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen [15] years."). But, under Kansas law, a cotenant may not obtain ownership of another cotenant's property by adverse possession.

> "We also note the rule that a tenant cannot acquire title by adverse possession
> against his [or her] contenants. The rule as applied to mineral interests is stated in 3 Am.
> Jur. 2d, Adverse Possession, § 221, pp. 317, 318, as follows:
>> "'After severance of the surface and mineral estates, the mineral
>> owner must be disseised to lose his [or her] rights, and there can be no
>> disseisin by any act which does not actually take the mineral out of his
>> [or her] possession. It follows of course that the execution or recording

11

of deeds or leases of the minerals does not give title to the minerals by adverse possession.

"'In accordance with the general rule as to cotenants, it seems that where there is a severance of the surface and mineral estates the possession of the minerals by one cotenant does not give him [or her] title by adverse possession as against his [or her] cotenants unless there is an ouster of which they have notice.'" *Smith*, 209 Kan. at 615.

See also *Kneller*, 247 Kan. at 405 ("[T]he Land Bank does not meet the requirements for adverse possession in regard to its interest herein. Its role was wholly passive."); *Buchanan v. Rediger*, 26 Kan. App. 2d 59, 65, 975 P.2d 1235 ("The general common law rule of adverse possession is that a cotenant cannot claim full title against other cotenants absent an ouster because a cotenant's possession would not be adverse. This rule is based on the principle that a cotenant may safely assume, absent an ouster or other notice, that possession of property by one cotenant is not adverse."), *rev. denied* 267 Kan. 888 (1999).

If the Luther one-half interest in the minerals in the northeast quarter automatically reverted to King when the term of production ended and the Luther mineral interest holders became tenants-at-will with King, the statute of limitations simply does not apply because King owns all of the mineral rights and has merely allowed the Luther mineral interest holders to retain their interest while no production was occurring on the property. Stated another way, King has not taken action to oust the Luther mineral interest holders, although she certainly could have done so. But until the property began producing in payable quantities, there was probably not much incentive to do so. Nevertheless, in defending her claim to ownership of the property, we hold that King is not barred by the statute of limitations.

As noted above, in ruling on the statute of limitations issue, the district court mentioned that King had acquiesced to the term mineral holders. It is unclear whether the

12

court was simply stating that King had been sitting on her rights or whether the court intended acquiescence to form an independent basis for its judgment. But, since the Luther mineral interest holders claim that acquiescence formed an alternate basis for the judgment, it will be examined as such.

As used in this context, acquiescence is a species of estoppel. See *Chelf v. State*, 46 Kan. App. 2d 522, 536, 263 P.3d 852 (2011) (defining quasi-estoppel as "'an assertion of rights inconsistent with past conduct, silence by those who ought to speak, or situations wherein it would be unconscionable to permit a person to maintain a position inconsistent with one in which [the person] has acquiesced'" [quoting *Harrin v. Brown Realty Co.*, 226 Kan. 453, 458-59, 602 P.2d 79 (1979)]). In other words, acquiescence precludes a party from taking a legal position, in this case a claim of ownership, inconsistent with past actions.

We fail to see how King's actions have been inconsistent with her current claim of ownership. The record is not clear whether the parties were receiving royalty payments. If King received royalty payments and knew that no production was occurring on the northeast quarter, she could easily presume that the royalties were paid as the result of the unitized oil and gas lease, payment under which not being governed by the terms of the deed reservation for mineral interests.

As far as the record demonstrates, King would have no specific knowledge whether the Luther mineral interest holders were also receiving royalty payments or that her royalty payments represented only half of the royalty payments available. Based on Oxy USA, Inc.'s inability to determine the proper recipient of royalty payments for the Tice Cattle #3 well, it is far more likely that King and the Luther mineral interest holders were not receiving any royalties until 2009. If the northeast quarter was not generating revenue, King would have had notice that the property was not producing minerals, but

13

she also would lack any specific incentive to quiet title against the Luther mineral interest holders unless she planned to sell the property.

Permitting a tenancy-at-will when no royalty payments are at issue for the production of minerals on a property is not a position inconsistent with King's claim of ownership that should preclude her from making a claim of ownership in a quiet title action brought by another party. We hold that a claim of acquiescence simply does not apply to the reversionary interest of King to the Luther mineral interests.

As an alternative basis for affirming the district court's ultimate conclusion, the Luther mineral interest holders claim that the district court improperly construed the holding of *Smith* in applying it to trigger King's reversionary interest.

In *Smith*, the Kansas Supreme Court held that production on property other than the subject property under a unitized lease agreement could not prevent reversion of a defeasible mineral interest conditioned upon production when no production was occurring on the subject property. 209 Kan. at 614. While the language in the deed creating the defeasible property interest in *Smith* was very similar to the language used in this case, the Luther mineral interest holders contend that *Smith* is factually distinguishable in that the lease in *Smith* was created after the deed, whereas the deed at issue in this case reflected the parties' understanding of an extant lease.

In July 1943, Flora A. Meredith executed an oil and gas lease with Joe E. Denham on the northeast quarter. The lease provided for a term of 10 years but included an extension "as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them is produced." The lease defined production in the following provision:

> "9.  As to the gas leasehold estate hereby granted (excluding casinghead gas produced from oil wells), lessee is expressly granted the right and privilege to consolidate

said gas leasehold with any other adjacent or contiguous gas leasehold estates to form a consolidated gas leasehold estate which shall not exceed a total area of 640 acres; and in the event lessee exercises the right and privilege of consolidation as herein granted, the consolidated gas leasehold estate shall be deemed, treated and operated in the same manner as though the entire consolidated leasehold estate were originally covered by and included in this lease, and all royalties which shall accrue on gas (excluding casinghead gas produced from oil wells), produced and marketed from the consolidated estate, including all royalties payable hereunder, shall be prorated and paid to the lessors of the various tracts included in the consolidated estate in the same proportion that the acreage of each said lessor bears to the total acreage of the consolidated estate, and a producing gas well on any portion of the consolidated estate shall operate to continue the oil and gas leasehold estate hereby granted so long as gas is produced therefrom."

When Luther conveyed the property to E.W. Rahenkamp in 1945, he conveyed the property subject to the lease.

The Luther mineral interest holders contend that "production" as used in the reservation of mineral interests in the deed should be read as "production" as defined in the lease agreement. The reasoning is tenuous. None of the authority cited by the Luther mineral interest holders suggests that a court will read the creation of a defeasible property interest together with the terms of a lease.

Courts often refer to the manner in which terms-of-art are construed in oil and gas leases to determine the legal effect of similar terms in a reservation of mineral rights. See *Texaco, Inc. v. Fox*, 228 Kan. 589, 592, 618 P.2d 844 (1980) (construing "thereafter" in a deed in the same manner as it is commonly understood in an oil and gas lease); *McAfee v. City of Garnett*, 205 Kan. 269, 274-75, 469 P.2d 295 (1970) (noting that specialized terms in a given trade are presumed to carry the specialized meaning in contracts involving those trades); *Wilson*, 164 Kan. at 237 (looking generally to the application of habendum clauses in oil and gas leases to construe the effect of similar clauses in a mineral deed). The use of trade language to interpret a deed conveying a term mineral

15

interest, however, does not justify the use of specific contract terms in a given oil and gas lease to interpret the meaning of a term mineral interest.

"Production" does not have a specialized meaning within the oil and gas industry that encompasses oil or gas obtained from any well under a unitized lease and certainly did not have that meaning in 1945 when the deed at issue was created. If "production" had the specialized meaning the Luther mineral interest holders claim, the lease agreement would not have needed to specify that "production" meant payable quantities of oil or gas from any well within the unitized properties. If "production" was a term-of-art in the oil and gas community in 1945 that meant what the Luther mineral interest holders propose, *Smith* would have been decided very differently.

Instead, borrowing reasoning from *Dewell v. Federal Land Bank*, 191 Kan. 258, 263, 380 P.2d 379 (1963), the *Smith* court noted the legal distinctions between the lease and the deed:

> "[T]he shut-in royalty clause contained in the leases was for the sole benefit of the lessee. It was a privilege granted the lessee in lieu of production. It does not purport to convey any rights to anyone else. It does not purport to extend the interest of the holders of the mineral rights. We said the mineral reservation and the separate oil and gas leases executed by the parties should not be construed together." *Smith*, 209 Kan. at 612.

Although the Kansas Supreme Court reversed its reasoning in *Smith* a few years later in *Classen*, it did not do so on the basis of reading the oil and gas lease and the deed reservation in pari materia, as the Luther mineral interest holders suggest. Instead, *Classen* affirmed the portion of *Smith* that held: "[A]bsent agreement to the contrary, a term mineral interest cannot be changed or altered by the terms of an oil and gas lease or a unitization agreement entered into between the term mineral owner and a third party lessee or by the holder of the reversionary interest and a third party lessee." *Classen*, 228

16

Kan. at 434. The court reversed its decision in *Smith* on "other controlling circumstances," involving primarily policy decisions.

Moreover, the Kansas Supreme Court has more recently rejected an argument similar to the argument forwarded by the Luther mineral interest holders in this case. See *Netahla v. Netahla*, 301 Kan. 693, 346 P.3d 1079 (2015).

In *Netahla*, the landowners entered a lease for the production of oil and gas. About 7 months later, the landowners conveyed the mineral interests in the property for a period of 15 years "'and as long thereafter as oil and/or gas is produced from these premises or the property is being developed or operated.'" 301 Kan. at 694-95. Although a well was drilled, the lessee declared it a shut-in well and did not produce oil or gas from the well from June 1, 1985, until 2003. As in the present case, the holders of the mineral deed in *Netahla* argued that production under the terms of the mineral deed should be construed according to the terms of the lease in effect at the time of the deed. The Kansas Supreme Court disagreed. 301 Kan. at 693-96.

After reaffirming its reasoning in *Dewell* regarding the different parties involved in the creation of the lease and in the creation of the mineral interest, the court ultimately concluded:

> "In light of the caselaw cited above, we hold that the 'subject to' clause in the mineral deed here did not incorporate the provisions of the lease. We therefore look only at the provisions of the mineral deed itself to determine whether defendants' mineral interest has terminated." *Netahla*, 301 Kan. at 702.

Consequently, the district court here correctly rejected the Luther mineral interest holders' argument related to reading the deed reservation in light of the oil and gas lease. Since the change in law stated within *Classen* operated only prospectively, the court

17

properly held that the rule announced in *Smith* governed the reversionary interest in this case. Because the defeasible property interest terminated under the authority of *Smith*, it could not be revived under the authority of *Classen*. See *Kneller*, 247 Kan. at 404 ("To apply *Classen* retroactively herein would make a phoenix out of a defeasible or mineral interest which had, under the existing Kansas law, expired eight years prior to the filing of *Classen*. Such would not constitute an extension of the term interest but a revival of the same many years after its demise."); *Wagner v. Sunray Mid-Continent Oil Co.*, 182 Kan. 81, 88-89, 318 P.2d 1039 (1957) ("[W]hen a mineral deed has terminated because of cessation of production, it is not revived by subsequent production of oil even though it be in the same well.").

Although the district court correctly held that the cessation of production on the northeast quarter triggered reversion of the Luther mineral interest to the property owner, *i.e.*, King, the court incorrectly interpreted the effect of reversion and improperly held that King's claim to the property was barred by the statute of limitations and/or acquiescence.

Reversed and remanded with instructions to enter judgment for King.